**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

ELI LILLY AND COMPANY,

        *Plaintiff*,

    v.

DOROTHY FINK, in her official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

and

SARA BRENNER, in her official capacity, and FOOD AND DRUG ADMINISTRATION,

        *Defendants*.

Case No. 1:24-cv-1503-TWP-KMB

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE...................................................... 3

    A.  The PHSA Regulates "Protein[s]" and "Analogous Product[s]"
          as Biological Products............................................................................................. 3

    B.  Lilly Develops Retatrutide to Treat Obesity, Diabetes, and Other Conditions ............... 5

    C.  FDA Denies Lilly's Request to Designate Retatrutide as a Biological Product............. 7

LEGAL STANDARD............................................................................................................... 9

ARGUMENT ....................................................................................................................... 10

    A.  Retatrutide Is a Protein and Thus a Biological Product ................................................ 10

    B.  At Minimum, Retatrutide Is Analogous to a Protein ................................................... 19

    C.  No Remand Is Warranted.............................................................................................. 28

CONCLUSION..................................................................................................................... 30

CERTIFICATE OF SERVICE .............................................................................................. 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abt v. Mazda Am. Credit,*
25 F. Supp. 2d 860 (N.D. Ill. 1998) ...................................................................13

*Airmark Corp. v. FAA,*
758 F.2d 685 (D.C. Cir. 1985) ..........................................................................25

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) .........................................................................17

*Atain Ins. Co. v. Swick Logistics, LLC,*
No. 24-cv-339, 2024 WL 4213279 (N.D. Ill. Sept. 17, 2024) ................................15

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) .........................................................................................12

*Carcieri v. Salazar,*
555 U.S. 379 (2009) .........................................................................................12

*United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.,*
606 F.3d 361 (7th Cir. 2010) ............................................................................24

*City & Cnty. of San Francisco v. FERC,*
24 F.4th 652 (D.C. Cir. 2022) ...........................................................................15

*City of Chicago, Ill. v. Fulton,*
592 U.S. 154 (2021) .........................................................................................23

*Clark v. Martinez,*
543 U.S. 371 (2005) .........................................................................................23

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
587 U.S. 262 (2019) .......................................................................................2, 23

*Commodity Carriers, Inc. v. Fed. Motor Carrier Safety Admin.,*
434 F.3d 604 (D.C. Cir. 2006) ...........................................................................16

*Conway v. O'Malley,*
96 F.4th 1275 (9th Cir. 2024) ............................................................................13

*Cox v. Benson,*
548 F.2d 186 (7th Cir. 1977) ..............................................................................9

*Fort Stewart Sch. v. FLRA*,
495 U.S. 641 (1990)..........................................................................9

*Gendron v. United States*,
154 F.3d 672 (7th Cir. 1998) ........................................................15

*Greater Boston Television Corp. v. FCC*,
444 F.2d 841 (D.C. Cir. 1970)........................................................25

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
108 F.4th 836 (D.C. 2024)...............................................19, 27, 28

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
678 F. Supp. 3d 20 (D.D.C. 2023) ................................................19

*Johnson v. OPM*,
783 F.3d 655 (7th Cir. 2015) ........................................................28

*Kisor v. Wilkie*,
588 U.S. 558 (2019)..................................................................14, 15

*Laclede Gas Co. v. FERC*,
873 F.2d 1494 (D.C. Cir. 1989) ....................................................16

*Lindh v. Murphy*,
521 U.S. 320 (1997)........................................................................12

*Loper Bright v. Raimondo*,
603 U.S. 369 (2024)..................................1, 3, 9, 10, 14, 25, 26, 27, 28, 29

*McBride v. Grice*,
576 F.3d 703 (7th Cir. 2009) ........................................................15

*McFadden v. United States*,
576 U.S. 186 (2015)........................................................................19

*McNutt v. Bd. of Trustees of Univ. of Ill.*,
141 F.3d 706 (7th Cir. 1998) ........................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)......................................................................9, 26

*Ohio v. EPA*,
603 U.S. 279 (2024)........................................................................25

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)............................................................................9

*Reno v. Bossier Parish School Bd.*,
  528 U.S. 320 (2000)............................................................................................23

*Rotkiske v. Klemm*,
  589 U.S. 8 (2019).............................................................................................19

*Russello v. United States*,
  464 U.S. 16 (1983).............................................................................................12

*Smart Oil, LLC v. DW Mazel, LLC*,
  970 F.3d 856 (7th Cir. 2020).................................................................................29

*In re Southwest Airlines Voucher Litig.*,
  799 F.3d 701 (7th Cir. 2015) ................................................................................17

*Teva Pharms. USA, Inc. v. FDA*,
  514 F. Supp. 3d 66 (D.D.C. 2020) ........................................................5, 11, 14, 15, 20, 24, 25

*In re Trendsetter HR L.L.C.*,
  949 F.3d 905 (5th Cir. 2020) ................................................................................13

*Turner-El v. Illinois Bd. of Educ.*,
  No. 93-cv-4918, 1996 WL 480341 (N.D. Ill. Aug. 21, 1996) ................................................13

*United States v. Boender*,
  649 F.3d 650 (7th Cir. 2011) ................................................................................12

*United States v. Gonzales*,
  520 U.S. 1 (1997)...........................................................................................12, 13

**Statutes**

5 U.S.C.
  § 706(2)..................................................................................................9, 28

18 U.S.C.
  § 924(c)......................................................................................................12

21 U.S.C.
  § 355..........................................................................................................3
  § 355(d).......................................................................................................29
  § 360bbb-2(a).................................................................................................5
  § 360bbb-2(b)...............................................................................................5, 29
  § 360bbb-2(c)...............................................................................................5, 29
  § 802(32)(A)..................................................................................................19

42 U.S.C.
  § 262................................................................................................................3
  § 262(i)(1) ........................................................................1, 3, 19, 22, 26
  § 262(a) ..........................................................................................................29
  § 262(a)(1)(A) ..............................................................................................3

Pub. L. No. 116-94, Div. N, Tit. I, § 605, 133 Stat. 3127 (2019)....................17

**Regulations**

21 C.F.R.
  § 3.7................................................................................................................5
  § 314.50 ........................................................................................................29
  § 600.3(h)(4) ................................................................................................22
  § 600.3(h)(5) ..................................................................................................2
  § 600.3(h)(5)(i) ............................................................................................22
  § 600.3(h)(5)(ii) ..........................................................................................23
  § 600.3(h)(5)(iii) ..........................................................................................22
  § 600.3(h)(6) ..............................1, 4, 5, 8, 10, 11, 12, 13, 16, 17, 19, 28
  § 601.2 ..........................................................................................................29

85 Fed. Reg. 10,057 (Feb. 21, 2020) ........................................................4, 15, 27

85 Fed. Reg. 12,930 (Mar. 5, 2020)................................................................14

**Other Authorities**

*American Heritage Science Dictionary* 507 (2005)........................................25

*Analogous*, Merriam-Webster Dictionary, https://tinyurl.com/y49khdfa............19, 21

*Analogous*, Webster's Third New Int'l Dictionary 77 (2002) ..................19, 21

Antonin Ginguay & Luc A. Cynober, *Amino Acids*, in Encyclopedia of Biological
  Chemistry (3d Ed. 2021)......................................................................................18

FDA Mem. in Support of Cross-Mot. for Summ. J., *Ipsen Biopharmaceuticals,
  Inc. v. Becerra*, No. 20-cv-2437 (D.D.C. Nov. 20, 2020), 2020 WL 13280713 ....................13

Michael D. Larrañaga et al., *Hawley's Condensed Chemical Dictionary* 64 (16th
  ed. 2016) ..........................................................................................................4

Roger L. Lundblad, *Biochemistry and Molecular Biology Compendium* 175
  (2019)..............................................................................................................11

Sogroya Prescribing Information § 11 (April 2023),
  https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/761156s005lbl.pdf....................11

Tresiba Prescribing Information § 11 (July 2022),
    https://www.novo-pi.com/tresiba.pdf .......................................................................................17

*Webster's Third New Int'l Dictionary* (1981)...........................................................................13

## INTRODUCTION

Federal law channels products designed to prevent or treat disease into two different approval pathways, depending on whether the product is a "drug" or a "biological product." That distinction carries importance, both for the developers of new products and for the patients who will use them. The Food and Drug Administration's authority to approve a "biological product" applies to all "protein[s]" and products "analogous" to proteins that are "applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). But the Supreme Court has made clear that interpreting the statutory definition of "biological product" requires finding the best reading of the text, not deferring to an agency's chosen interpretation or policy preference. *See Loper Bright v. Raimondo*, 603 U.S. 369, 374 (2024); *accord id.* at 452 (Kagan, J., dissenting) (identifying this specific question as one that courts must now resolve).

This case concerns FDA's determination that retatrutide, an investigational product being studied to treat obesity and related health conditions, is a drug rather than a biological product. Under FDA regulations, a "protein" is defined in relevant part by the "total number of amino acids" it contains: If it is "greater than 40 amino acids in size," and satisfies other regulatory requirements not in dispute here, the product is a protein. 21 C.F.R. § 600.3(h)(6). Retatrutide is composed of 41 amino acids—a number plainly "greater than 40." But FDA rejected Eli Lilly and Company's request to designate retatrutide as a biological product on the ground that only 40 of those are *alpha* amino acids, which is a particular subtype of amino acid.

FDA's decision contravenes its own regulatory definition of "protein," which includes "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." *Id.* Although the regulation clearly states that a protein must be "greater than 40

amino acids in size," the agency now insists that it must be "greater than 40 *alpha* amino acids in size." But that limitation appears nowhere in the statute (which does not define proteins in terms of amino acids at all) or the regulation—which distinguishes, including within the same sentence, between amino acids generally and the narrower category of alpha amino acids. FDA's reasons for departing from the regulation's plain text fail to withstand even the most superficial scrutiny.

FDA also concluded that retatrutide does not qualify as "analogous" to a protein, even though it did not claim that retatrutide's structure and function are meaningfully different from a protein composed solely of alpha amino acids. FDA has never promulgated a regulation setting forth criteria for when a product qualifies as "analogous" to a protein. But in defining other "analogous" products that qualify as biologics, the agency has employed a functional approach. *See id.* § 600.3(h)(5). Its failure to use the same approach here for products "analogous" to a protein violates the maxim that "a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019).

The agency's only ground for deeming retatrutide not "analogous" to a protein here is that it lacks the minimum 41 alpha amino acids that FDA interprets as a requirement of the regulatory "protein" definition. But that bootstrapped explanation—retatrutide is not a protein so therefore cannot be analogous to a protein—collapses the statutory distinction between proteins and "analogous" products, effectively erasing an entire category of biological products. Moreover, the agency's proffered rationale for adopting that reading was arbitrary: Rather than making a good-faith effort to determine the best interpretation of the statutory language, FDA simply asserted that it would be more convenient to have a "bright-line rule." AR 1934 (citation omitted). That policy-driven interpretation had no basis in the statute or in the agency's scientific expertise.

2

In both respects, FDA failed to engage in the reasoned and reasonable decision-making that the Administrative Procedure Act requires. FDA, like any agency, must act within statutory and regulatory constraints. It is bound to follow the statutory definition of "biological product" and the agency's own regulations interpreting the term "protein." This Court should set aside FDA's erroneous decision rejecting Lilly's proposed classification of retatrutide and should order the agency to properly designate retatrutide as a biological product.

### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**A.    The PHSA Regulates "Protein[s]" and "Analogous Product[s]" as Biological Products**

1.    Under the Public Health Service Act (PHSA), a person who introduces "any biological product" into interstate commerce must have a "biologics license." 42 U.S.C. § 262(a)(1)(A). Congress has given the Secretary of Health and Human Services authority to oversee biologics licensing. *Id.* § 262. The Secretary relies on FDA to implement the licensing scheme. Although FDA supervises marketing approvals both for drugs and for biological products, the two licensing regimes differ in application requirements, marketing rules, and exclusivity, among other features. *Compare* 42 U.S.C. § 262 (standards for biologics), *with* 21 U.S.C. § 355 (standards for drugs).

Congress has defined "biological product" to include "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product" that is "applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). The statute does not further define "protein" or "analogous product." Nor does the statute specifically direct the Secretary to promulgate further definitions of those terms. Their meaning is accordingly a question of statutory interpretation for the courts. *See Loper Bright*, 603 U.S. at 374; *accord id.* at 452, 456, 460 (Kagan, J., dissenting) (identifying, as

a question that courts must resolve, the PHSA's definition of "'biological products,' including 'proteins'") (cleaned up).

Under FDA regulations, "[a] protein is any [1] *alpha amino acid polymer* with [2] a *specific, defined sequence* that [3] is *greater than 40 amino acids in size*." 21 C.F.R. § 600.3(h)(6) (emphases added). In adopting that definition, FDA acknowledged that there is no "clear scientific consensus" on the meaning of "protein," and the agency explained that it adopted this definition in substantial part for policy reasons: to establish, for this one category of biological products enumerated in the statute, a "scientifically reasonable, bright-line rule that provides regulatory clarity and facilitates implementation" of the statute, as well as to "facilitate[] efficient use of time and resources both by FDA and applicants" and to "reduce[] regulatory uncertainty." 85 Fed. Reg. 10,057, 10,059 (Feb. 21, 2020).

FDA regulations do not further define "alpha amino acid polymer"—nor, for that matter, "amino acid" or "alpha amino acid." The parties agree, consistent with FDA practice, that a "polymer" is a large molecule made up of smaller units, such as amino acids. An "amino acid" is a molecule that has both an amino group and a carboxylic acid group. *See* Michael D. Larrañaga et al., *Hawley's Condensed Chemical Dictionary* 64 (16th ed. 2016). And alpha amino acids are amino acids in which those two functional groups are linked together in a particular way—namely, they "have the carboxyl group [of the carboxylic acid] linked to the alpha carbon of their carbon chain." FDA, Memo to File, *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Doc. 46, at FDA0292 n.3; *see* AR 1931 ("If there are any additional carbons between the amino group and carboxy group, it is not an alpha amino acid."). Finally, for a product to have a "specific, defined sequence," FDA has explained that the product's amino acids must be added to the

polymer by "following a pre-defined template" that results in an "identical sequence across batches." *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106 (D.D.C. 2020).

FDA's regulations also provide express instructions for determining whether an amino acid polymer "is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). "When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature," the regulations provide that "the size of the amino acid polymer for purposes of [the protein definition] will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence." *Id.*

2.    Section 563 of the Federal Food, Drug, and Cosmetic Act (FDCA) allows a person to "submit a request to the Secretary respecting the classification of [a] product," including a request that the product be classified as a drug or biological product. 21 U.S.C. § 360bbb-2(a). FDA's regulations refer to this type of request as a "request for designation." 21 C.F.R. § 3.7.

The FDCA imposes a strict deadline for the agency's response: "Not later than 60 days after the receipt" of a request for designation, the agency must "determine the classification of the product" and must issue a "written statement that identifies such classification." 21 U.S.C. § 360bbb-2(b). If FDA "does not provide" a letter of designation by the 60-day statutory deadline, then "the recommendation made by the person" requesting classification "shall be considered to be a final determination" of the product's classification. *Id.* § 360bbb-2(c). A final determination of a product's classification "may not be modified" except with the requester's "written consent," or else "for public health reasons based on scientific evidence." *Id.*

**B.    Lilly Develops Retatrutide to Treat Obesity, Diabetes, and Other Conditions**

Through years of study, including ongoing clinical testing, Lilly has developed retatrutide to help adults manage obesity and associated health concerns, including type 2 diabetes. AR 1908-10. Mirroring the function of other proteins that occur natively in humans, retatrutide operates as

an agonist of three hormone receptors within the body, meaning that it binds to and activates those receptors. AR 1905; *see* AR 1917. By doing so, retatrutide induces metabolic benefits, including enhancing insulin secretion, modulating energy consumption, and facilitating fat utilization. AR 1908. This novel three-receptor (or tri-agonist) approach allows retatrutide, among other things, to stimulate substantial weight loss. AR 1909-10.

Retatrutide has undergone numerous tests to validate its safety and efficacy. *See* AR 1909-10. Phase 1 and Phase 2 clinical studies have demonstrated that treatment with retatrutide is associated with significant reductions in body weight, daily mean glucose levels, and glycated hemoglobin, as well as improvements in other cardiometabolic measures. AR 1910. Phase 3 clinical studies are ongoing. *Id.* Lilly has proposed retatrutide's use for chronic weight management, obstructive sleep apnea, osteoarthritis, and type 2 diabetes. AR 1908.

Like many other proteins, retatrutide is a polymer containing alpha amino acids. It has a consistent three-dimensional structure, including a clear alpha helical structure that is characteristic of proteins. AR 1905-06. Retatrutide is composed of an amino acid backbone and an associated amino acid chain. Its backbone comprises a chain of 39 alpha amino acids linked together by peptide bonds. *Id.* The backbone is connected to a second, associated chain composed of two more amino acids: gamma-glutamate, which is an alpha amino acid; and 8-amino-3,6-dioxaoctanoic acid (ADO), which is a non-alpha amino acid. *Id.*; *see* AR 1913-14. Both chains serve key functions. The chain of ADO and gamma-glutamate (along with an associated fatty acid) helps facilitate binding to albumin, thereby extending the molecule's pharmacokinetic half-life—*i.e.*, how long the molecule stays in the patient's body—while simultaneously providing desired pharmacological properties. *See* AR 1905-06, 1917.

ADO and gamma-glutamate are associated with optimal receptor activities and other benefits that enhance retatrutide's effectiveness. AR 1906. ADO also serves as a structural bridge when both the backbone and associated chain bind to albumin, a typical function served by amino acids in a protein. AR 1906. The backbone and associated chain are bound to one another by an isopeptide bond, which is a type of bond found in naturally occurring proteins. AR 1905, 1913. Retatrutide thus has structural and functional features similar to the 42-amino acid glucose-dependent insulinotropic polypeptide (GIP), which is a naturally occurring protein hormone. AR 1917; *see* AR 1929.

### C.    FDA Denies Lilly's Request to Designate Retatrutide as a Biological Product

On November 9, 2023, Lilly submitted to FDA a request for designation seeking classification of retatrutide as a biological product. AR 1875. Following discussions in which the agency requested additional information, Lilly submitted a new superseding request for designation on January 19, 2024. *See* AR 1892-1903 (FDA "Not Filed" letter); AR 1904-18 (superseding request for designation).

On March 18, FDA issued a letter of designation denying Lilly's request. AR 1928-36. The agency "disagree[d] with [Lilly's] recommendation that retatrutide should be classified as a biological product" and instead "determined that [the] product is a drug." AR 1936.

According to FDA, retatrutide does not qualify as a protein because "it is not composed of more than 40 alpha amino acids." AR 1931. Although the agency did not dispute that retatrutide has 41 total amino acids, it took the position that "only alpha amino acids are relevant to determining whether something is a protein." AR 1932. While ADO is an amino acid, the agency stated, it "is not an *alpha* amino acid because it does not contain an amino group and a carboxylic acid group separated by a single carbon." AR 1932. As a result, "ADO [wa]s not counted" toward

the total, AR 1932, and thus, in FDA's view, retatrutide did not have "greater than 40 amino acids," 21 C.F.R. § 600.3(h)(6)—it had only 40.

FDA acknowledged that "the definition of protein in 21 CFR 600.3 does not repeat the 'alpha' modifier each time the definition uses the term amino acid." AR 1932. But the agency nevertheless asserted that "doing so was not necessary given that 'alpha amino acid polymer' was used at the beginning of the definition." AR 1932. The agency further asserted that its reading was supported by "common scientific knowledge," a claim the agency supported with a footnote citing generally to a single source—an entry in a biochemistry encyclopedia that discusses the general role of alpha amino acids in various biological processes. AR 1932 & n.17.

In reaching its decision, FDA "assume[d]" that the other components of the protein definition had been met: It "assume[d] (without conceding) that retatrutide has a specific defined sequence," "assume[d] that ADO is an amino acid," and "assume[d], without deciding, that gamma glutamate is an alpha amino acid and that the associated chain composed of ADO and gamma glutamate is associated with the main 39-alpha amino acid chain in a manner that occurs in nature." 1931-32. The agency's decision included no analysis or evidence contrary to these assumptions.

FDA next concluded that retatrutide was not "analogous to a protein" because it did not satisfy "the bright line principle established by the rule," AR 1935—that is, because retatrutide did not satisfy FDA's regulatory definition of "protein" in 21 C.F.R. § 600.3(h)(6). According to the agency, treating retatrutide as "analogous" to a protein would "effectively include alpha amino acid polymers with fewer than 41 alpha amino acids within the scope of a rule that was intended to exclude them," thereby "defeat[ing] the purpose of the bright line rule because FDA would frequently have to evaluate on a case-by-case basis the features of a particular molecule to determine if it is analogous to a protein." AR 1935. The agency further stated, without citing any

8

source, that "being greater than 40 *alpha* amino acids is a fundamental, defining property of a protein," such that "retatrutide cannot be analogous to a protein because it does not share this fundamental defining property." AR 1936.

## LEGAL STANDARD

Under the Administrative Procedure Act, the Court must hold unlawful and set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Among other things, agency decision-making is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In addition, "[i]t is a familiar rule of administrative law that an agency must abide by its own regulations," and an agency's failure to do so is reversible error. *Fort Stewart Sch. v. FLRA*, 495 U.S. 641, 654 (1990); *see, e.g.*, *Cox v. Benson*, 548 F.2d 186, 189 (7th Cir. 1977) (agency action "arbitrary and capricious" because it "contravene[d] its own regulations").

Determining what falls within the statutory definition of a "biological product" is an interpretative question that must ultimately be resolved by the courts, rather than by FDA. *See Loper Bright*, 603 U.S. at 394; *accord id.* at 452 (Kagan, J., dissenting) (identifying this specific question as one that, under the majority's opinion, courts must decide). "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413 (majority opinion). "Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'" *Id.* at 392 (quoting *Perez v.*

9

*Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)). In performing that task, the Court must employ "traditional tools of statutory construction" rather than deferring to an agency's "policy preferences." *Id.* at 403.

## ARGUMENT

FDA's refusal to designate retatrutide as a biological product is arbitrary, capricious, and not in accordance with law. Asserting that a "bright-line rule" was necessary to avoid "inefficiency," the agency concluded that retatrutide qualified neither as a protein nor as an analogous product because only 40 of its 41 amino acids are alpha amino acids. AR 1934 (citation omitted). That conclusion directly contravenes FDA's own regulations, which define a protein based on the "total number of amino acids"—not alpha amino acids—it contains. 21 C.F.R. § 600.3(h)(6). And the agency's policy-driven definition of "analogous" is impossible to square with the statute's plain meaning and does violence to any plausible theory of Congress's intent. The Court should accordingly set aside FDA's unlawful designation decision and enter an injunction requiring FDA to designate retatrutide as a biological product.

### A.    Retatrutide Is a Protein and Thus a Biological Product

Retatrutide is a protein under FDA's own regulatory definition. The grounds asserted by the agency for its contrary conclusion conflict with the regulatory text; and they are unpersuasive and illogical in any event.

**1.**    Under FDA's regulations, a product is a protein if it: (1) is an "alpha amino acid polymer," (2) has "a specific, defined sequence," and (3) "is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). When determining "the size of the amino acid polymer," the regulation requires counting "the total number of amino acids" across "two or more chains in [the] amino

acid polymer" if the chains are "associated with each other in a manner that occurs in nature." *Id.* Retatrutide satisfies each of those criteria.

First, as the agency did not dispute, retatrutide is an "alpha amino acid polymer" and has "a specific, defined sequence." AR 1914; *see* AR 1931-32. Retatrutide is an alpha amino acid polymer because it is a polymer that contains alpha amino acids. AR 1914. Nothing in FDA's regulations requires an alpha amino acid polymer to be composed *solely* of alpha amino acids, nor did FDA contend otherwise. To the contrary, FDA has previously approved biologics licenses for products composed of a mix of alpha and non-alpha amino acids. *See* Sogroya Prescribing Information § 11 (April 2023), available at https://www.accessdata.fda.gov/drugsatfda_docs/label /2023/761156s005lbl.pdf; *see also* AR 1933 (agreeing that Sogroya's inclusion of additional ADO units, which are not alpha amino acids, "d[id] not change that Sogroya is a protein"). And retatrutide has a "specific, defined sequence" because it is synthesized according to "a pre-defined template" that results in an "identical sequence across batches." *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106 (D.D.C. 2020); *see* AR 1913.

Retatrutide also has "more than 40 amino acids," all of which are—as the agency again did not dispute—"associated with each other in a manner that occurs in nature." AR 1913 (quotation marks omitted); *see* AR 1922, 1931. Retatrutide's backbone comprises 39 amino acids, and its associated chain contains two more. AR 1905. The associated chain connects to the backbone via an "isopeptide bond," which is "an amide bond between a carboxyl group of one amino acid and an amino group of another amino acid"—a type of bond that commonly occurs in nature. *See* Roger L. Lundblad, *Biochemistry and Molecular Biology Compendium* 175 (2019). The "total number of amino acids in [retatrutide's] chains" is thus 41, which is "more than 40." 21 C.F.R. § 600.3(h)(6).

The regulation's plain text makes clear that retatrutide—which undisputedly contains 41 amino acids—is "greater than 40 amino acids in size," 21 C.F.R. § 600.3(h)(6), regardless of whether one of its amino acids (ADO) is a non-alpha amino acid. The regulation defines the relevant size as "greater than 40 *amino acids*," not "greater than 40 *alpha* amino acids." That omission is particularly significant, given the regulation's specification that a protein must be an "*alpha* amino acid polymer." *Id.* (emphasis added). Under the so-called *Russello* presumption, "[w]here [the drafter] includes particular language in one section of [a law] but omits it in another section of the same [law], it is generally presumed that [the drafter] acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted); *see, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 389-90 (2009) (relying on *Russello* presumption); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (same).

The *Russello* presumption has special force, moreover, where the omission appears in nearby text. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (finding it "significant" that a modifier was included for one phrase, but "no similar restrictions modifies [a] phrase" that "appears only two sentences later"); *McNutt v. Bd. of Trustees of Univ. of Ill.*, 141 F.3d 706, 709 (7th Cir. 1998) ("The omission of a similarly specific reference in the very next statutory section therefore assumes special significance."); *see also United States v. Boender*, 649 F.3d 650, 660-61 (7th Cir. 2011) ("the Supreme Court has found that the 'negative implications raised by disparate provisions are strongest'" where the relevant language was adopted together) (quoting *Lindh v. Murphy*, 521 U.S. 320, 330 (1997)). *Gonzales* is particularly instructive. There, the Supreme Court considered whether a provision that prohibited certain federal sentences from running "concurrently with *any* other term of imprisonment" applied to state-imposed sentences. 520 U.S. at 2-3 (quoting 18 U.S.C. § 924(c)) (emphasis added). The Court noted that the first

12

sentence of the same subsection also used the word "any," but it did so in a manner "expressly limited . . . to only federal crimes." *Id.* at 5. The Court accordingly found it "significant that no similar restriction modifies the phrase 'any other term of imprisonment,' which appears only two sentences later and is at issue in this case." *Id.* (citing *Russello*). Here, the regulation's failure to modify "amino acid" with "alpha" the second time it appears is even more significant, because the omission comes later within *the same sentence*.

This reading is further reinforced by the regulation's separate instruction that for polymers involving associated chains, "the size of the amino acid polymer for purposes of [the protein definition] will be based on the *total number of amino acids* in those chains." 21 C.F.R. § 600.3(h)(6) (emphasis added). "Total" encompasses the "entire quantity" of amino acids. *Conway v. O'Malley*, 96 F.4th 1275, 1279 n.2 (9th Cir. 2024) (quoting *Webster's Third New Int'l Dictionary*, 2414 (1981)); *see* FDA Mem. in Support of Cross-Mot. for Summ. J. at 17, 25, 38, *Ipsen Biopharmaceuticals, Inc. v. Becerra*, No. 20-cv-2437 (D.D.C. Nov. 20, 2020), 2020 WL 13280713 (discussing requirement that a protein's associated chains must "total more than 40 amino acids," without suggesting that only alpha amino acids count). Consistent with that definition, courts hold that the "plain and ordinary meaning" of the word "total" refers "unambiguously" to the entire set of the objects that it modifies. *In re Trendsetter HR L.L.C.*, 949 F.3d 905, 913 (5th Cir. 2020); *see, e.g.*, *Turner-El v. Illinois Bd. of Educ.*, No. 93-cv-4918, 1996 WL 480341, at *2 (N.D. Ill. Aug. 21, 1996) ("[t]en pages in total" includes all pages, not only a subset of pages); *Abt v. Mazda Am. Credit*, 25 F. Supp. 2d 860, 865 (N.D. Ill. 1998) ("total of other charges" includes all other charges, not only a subset of charges). And the regulation's reference to "the total number of amino acids," rather than to "the total number of *alpha* amino acids," once again triggers the *Russello* presumption.

Reading the regulation consistent with its ordinary meaning also comports with the broader regulatory context. FDA has expressed a preference for using its authority over biological products when handling relatively "complex" products. 85 Fed. Reg. 12,930, 12,931-32 (Mar. 5, 2020); *see Teva*, 514 F. Supp. 3d at 79 (explaining FDA's view that its "protein" definition is a "proxy for complexity"). Non-alpha amino acids (such as ADO) are often larger and more complex than alpha amino acids. For example, as compared to "alpha" amino acids as defined by FDA, ADO has additional carbons (and oxygens) between the amino group and the carboxyl group, making it larger and more complex. As described above, ADO has structural and functional attributes that contribute to the properties of the molecule, just like alpha amino acids do. Indeed, an approach that fails to count all alpha and non-alpha amino acids would mean that novel polymers of potentially *hundreds* of total amino acids would not count as proteins—despite the obvious complexity of such polymers—if only 40 of the amino acids were alpha amino acids. Nothing in FDA's regulations, much less the statutory text itself, supports such a result.

FDA's interpretation cannot be saved by the fact that, in the past, courts have sometimes "deferred to agencies' reasonable readings of genuinely ambiguous regulations." *Kisor v. Wilkie*, 588 U.S. 558, 563 (2019). That species of administrative deference cannot be reconciled with *Loper Bright*'s insistence "that questions of law [a]re for courts to decide, exercising independent judgment." 603 U.S. at 387. But even if it could, the agency's interpretation here still would not be entitled to *Kisor* deference. "First and foremost, a court should not afford . . . deference unless the regulation is genuinely ambiguous." *Kisor*, 588 U.S. at 574. As discussed above, the regulation's plain text and "all the traditional tools of construction" unambiguously foreclose the agency's reading that only *alpha* amino acids count. *Id.* at 575. Second, FDA's position here is a "new interpretation," *id.* at 579, which the agency debuted for the first time to defend the result in

14

this case, rather than an "authoritative" and generally applicable statement of agency policy, *id.* at 577. Indeed, in *other* cases, FDA has asserted that a "specific, defined sequence"—not the number of alpha amino acids—was the "critical" factor for distinguishing proteins. *Teva Pharms.*, 514 F. Supp. 3d at 133. Finally, FDA has sought to justify its interpretation on grounds of administrative convenience—namely, that considering a polymer's functional characteristics or complexity "would not provide for a bright-line rule and would result in regulatory uncertainty and inefficiency." AR 1925 (quoting 85 Fed. Reg. at 10,057). That practical consideration does not implicate FDA's "substantive expertise" and so warrants no deference. *Kisor*, 588 U.S. at 577.

  **2.** The agency's proffered grounds for requiring "more than 40 *alpha* amino acids," AR 1941 (emphasis added), contradict the PHSA and the regulatory text. They are also unpersuasive, over- and underinclusive, and internally contradictory.

  FDA principally asserted that because the phrase "'alpha amino acid polymer' was used at the beginning of the definition," it was "not necessary" to "repeat the 'alpha' modifier each time the definition uses the term amino acid." AR 1932. But as noted, traditional tools of interpretation mandate precisely the opposite inference: "Where [the drafter] includes particular language in one section of [a law] but omits it in another section of the same [law], it is presumed that [the drafter] intended to exclude the language, and the language *will not be implied where it has been excluded*." *Gendron v. United States*, 154 F.3d 672, 674 (7th Cir. 1998) (emphasis added); *see, e.g.*, *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009); *Atain Ins. Co. v. Swick Logistics*, LLC, No. 24-cv-339, 2024 WL 4213279, at *3 (N.D. Ill. Sept. 17, 2024). While FDA acknowledged this controlling precedent, *see* AR 1931-32, the agency failed to articulate a rationale for disregarding it—a defect that would render its decision arbitrary even if, contrary to fact, its interpretation were the best one. *See City & Cnty. of San Francisco v. FERC*, 24 F.4th 652, 665 (D.C. Cir. 2022) (agency

decision-making is "arbitrary and capricious" where agency "failed to address" relevant precedent).

FDA also relied on supposed "common scientific knowledge that alpha amino acids are the only relevant amino acids for determining whether something is a protein." AR 1932. That is because, the agency explained, "[a]lthough more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20 alpha amino acids." AR 1931-32. For that reason, the agency concluded, its position that "only alpha amino acids are relevant to determining whether something is a protein . . . is consistent with commonly understood scientific principles." AR 1932. But FDA may not "simply assert[]" that its view of common knowledge is correct; that sort of "[a]ssertion and reassertion, without more, is not the reasoned decisionmaking required of an administrative body." *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1499 (D.C. Cir. 1989); *cf. Commodity Carriers, Inc. v. Fed. Motor Carrier Safety Admin.*, 434 F.3d 604, 608 n.8 (D.C. Cir. 2006) ("reference to common knowledge does not in and of itself make it so absent evidence of such knowledge") (citation and quotation marks omitted).

Yet even if this sort of "everybody knows" reasoning were valid—and even if it could somehow override unambiguous regulatory text—the agency's invocation of such reasoning here is flawed on multiple grounds. For one thing, if FDA were correct that it is truly "common scientific knowledge that alpha amino acids are the only relevant amino acids for determining whether something is a protein," *id.*, then it would not have been necessary to specify that a protein is an "*alpha* amino acid polymer." 21 C.F.R. § 600.3(h)(6) (emphasis added). The fact that FDA was explicit that the relevant polymer must contain alpha amino acids shows that it *does not* go without saying that "alpha amino acids are the only relevant amino acids." The agency is thus contradicting itself: It specifies "alpha" in its regulation while simultaneously claiming that

specifying "alpha" is unnecessary because of common knowledge. Indeed, under the agency's reasoning, it is hard to see what work the word "alpha" does in the regulation at all. *See In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 710 (7th Cir. 2015) (describing "the canon against surplusage" as a "basic tool in statutory interpretation").

For another thing, FDA's attempt to limit the protein definition based on the type of amino acids present in "proteins of humans" is inconsistent with the statutory and regulatory text, which is *not* limited to "proteins of humans." It also contradicts Congress's decision, in 2019, to amend the statutory definition of protein to *remove* the prior exclusion for "chemically synthesized polypeptides" (*i.e.*, non-naturally synthesized proteins), Pub. L. No. 116-94, Div. N, Tit. I, § 605, 133 Stat. 3127 (2019), thereby confirming that the term "protein" now *does* include proteins that do not naturally occur in humans. Indeed, FDA has approved numerous non-naturally occurring proteins as biological products, such as Enbrel® (etanercept) and Orencia® (abatacept). In light of that fact—and Congress's deliberate choice to include chemically synthesized proteins—it makes particularly little sense to construe the protein definition as referring solely to the type of amino acids used in human protein synthesis.

FDA's attempt to define "protein" in terms of human biosynthesis is also overinclusive and underinclusive—producing an "internally inconsistent" definition that is inherently "arbitrary and capricious." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018). First, although the agency was correct that naturally occurring human proteins are synthesized almost exclusively from 20 alpha amino acids, its definition of a protein is *not* so limited. Instead, the regulatory definition also includes polymers composed of *any* alpha amino acids—even those that do *not* naturally occur in humans. *See* 21 C.F.R. § 600.3(h)(6); *see, e.g.*, Tresiba Prescribing Information § 11 (July 2022), available at https://www.novo-pi.com/tresiba.pdf. FDA has articulated no

justification for *excluding* non-alpha amino acids on the ground that they are not involved in human protein synthesis, while *including* alpha amino acids that are similarly not involved in human protein synthesis. FDA's definition is thus overinclusive based on its own rationale.

Second, FDA's definition of an "alpha amino acid" is also underinclusive, because it would exclude at least one of the 20 common amino acids involved in human protein biosynthesis. The agency asserted that ADO is not an "alpha amino acid" because it does not "contain an amino group and a carboxylic acid group separated by a single carbon." AR 1932. But proline—a common amino acid used in natural human protein synthesis—*also* fails to meet this strict definition, and so the agency's reading of the protein definition would exclude it. *See* Antonin Ginguay & Luc A. Cynober, *Amino Acids*, in Encyclopedia of Biological Chemistry at 2 (3d Ed. 2021) (proline's "–NH$_2$ group is part of a heterocycle," such that it lacks a standard amino group). FDA's focus on amino acids used to synthesize human proteins thus does not support its categorical exclusion of non-alpha amino acids.

Finally, and in any event, the agency's appeal to "commonly understood scientific principles," AR 1932, fails on its own terms. The single source that FDA cited in support of this supposed common understanding, *see* Antonin Ginguay & Luc A. Cynober, *Amino Acids*, *in* Encyclopedia of Biological Chemistry (3d Ed. 2021), provides no support for the agency's position. It is an entry in a biochemistry encyclopedia, which merely discusses the general role that alpha amino acids play in various biological processes—without addressing the definition of a protein *at all*. And FDA's source certainly does not say (or even suggest) that "alpha amino acids are the only relevant amino acids for determining whether something is a protein." AR 1932. In sum, the agency's reasoning cannot justify departure from the straightforward result mandated by

the regulation's text: Because retatrutide has more than 40 amino acids, it is "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6).

### B.    At Minimum, Retatrutide Is Analogous to a Protein

Retatrutide also qualifies as a biological product for the independent reason that it is, at minimum, an "analogous product" to a protein. 42 U.S.C. § 262(i)(1). Ignoring the close similarities in form and function between retatrutide and other proteins, FDA adopted a bright-line rule excluding all products that fail to satisfy every element of its "protein" definition, effectively reading the word "analogous" out of the statute. And the agency did so not on any scientific ground, but rather to advance its stated policy interests in improving administrative efficiency and avoiding case-by-case adjudication. That approach conflicts with the statute: Determining whether a product is "analogous" to a list of enumerated products by definition requires a case-by-case inquiry into its features and characteristics. The agency has no authority to disregard or abridge this statutory category, which *Congress* specifically enacted, for its own convenience.

1.    Statutory construction begins with the text, and "[i]f the words of a statute are unambiguous, this first step of the interpretive inquiry is [the] last." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (citation omitted). Dictionaries define "analogous" to mean "showing an analogy or a likeness permitting one to draw an analogy: susceptible of comparison either in general or in some specific detail." *Analogous*, Webster's Third New Int'l Dictionary 77 (2002) (Webster's); *see McFadden v. United States*, 576 U.S. 186, 193 (2015) (explaining that substances "analogous" to a controlled substance include those with a "'substantially similar'" chemical structure) (quoting 21 U.S.C. § 802(32)(A)). As a matter of plain meaning, then, a product is "analogous" to a protein when it is "similar or comparable" to a protein "either in general or in some specific detail." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 41 (D.D.C. 2023) (citing *Analogous*, Merriam-Webster Dictionary, https://tinyurl.com/y49khdfa), *aff'd*, 108 F.4th 836

(D.C. Cir. 2024). FDA itself has similarly taken the position in litigation that a product is analogous to proteins when it "share[s] some defining features with proteins." *Teva Pharm.*, 514 F. Supp. 3d at 113 (characterizing FDA's position).

Retatrutide easily surmounts that bar. Indeed, it shares nearly *every* defining feature with proteins, even under the interpretation of "protein" that the agency advances here. As FDA did not dispute, retatrutide contains 41 total amino acids in a specific, defined sequence, of which the vast majority (40 of them) are alpha amino acids. *See* AR 1917, 1931-32. Nor has the agency disputed that retatrutide shares critical structural and functional characteristics with proteins comprising 41 alpha amino acids. Like other proteins, retatrutide has a consistent three-dimensional structure, including a clear alpha helical structure that is characteristic of proteins, and it has structural and functional features similar to the 42-amino acid glucose-dependent insulinotropic polypeptide (GIP), which is a naturally occurring protein hormone. AR 1917; *see* AR 1929. Moreover, retatrutide's two-amino-acid chain of ADO and gamma-glutamate (along with an associated fatty acid) serves important functions, including facilitating binding to albumin to extend pharmacokinetic half-life, while simultaneously providing desired pharmacological properties— namely, receptor agonism, which is a typical function of proteins. AR 1917; *see* AR 1923.

In sum, more than 97% of retatrutide's 41 amino acids are *alpha* amino acids; it shares the key structural and functional characteristics of proteins; and the agency has identified no other feature that distinguishes it from other proteins. *See* AR 1935-36. Retatrutide—undisputedly an alpha amino acid polymer containing 41 total amino acids, 40 of which are alpha amino acids— should therefore, at a minimum, be considered "analogous" to a protein that contains 41 alpha amino acids, both under the plain meaning of that term and even as defined by FDA.

**2.**    FDA's contrary interpretation flouts the statute's text, its structure, and the agency's own past positions in rulemakings and litigation.

In rejecting Lilly's position that retatrutide is at least analogous to a protein, FDA took the blanket position that *no* "alpha amino acid polymers with fewer than 41 alpha amino acids" may *ever* qualify as a protein—regardless of whether the product is analogous to a protein in every other relevant respect. AR 1935. Indeed, in its decision, FDA identified only a single type of substance that it considers "analogous" to a protein: "naturally derived mixtures that include identified biological product components (e.g., protein) and identified non-biological product components that can contribute to the product's activity." AR 1935. In FDA's view, such a "naturally derived mixture [is] 'analogous' to a protein if the identified biological product component (the protein) in the mixture is necessary for the activity of the product and contributes to achieving the intended therapeutic effect of the product." AR 1935. In other words, the only product that FDA considers "analogous" to a protein is a mixture that *contains* a protein.

The PHSA's text forecloses that result. The word "analogous" plainly does not mean "contains," nor has FDA identified any basis for defining it that way. As noted, "analogous" means "showing an analogy or a likeness permitting one to draw an analogy: susceptible of comparison either in general or in some specific detail." Webster's at 77. That differs significantly from the meaning of "contain," which is "to have within" or "to consist of wholly or in part." *Id.* at 490-91. Thus, although it may be true that *some* products analogous to a protein will contain a protein, it is simply not true that *all* products analogous to a protein will contain a protein. For example, even if a sundae containing ice cream can be considered "analogous" to ice cream—since both are sweet frozen desserts made primarily from milk and edible with a spoon—that provides no reason to exclude all *other* foods that share those relevant characteristics, such as frozen yogurt, from the

21

list of items "analogous" to ice cream. Frozen yogurt remains "comparable to" or "similar to" ice cream, and thus fits squarely within the plain meaning of "analogous"—indeed, it fits even better.

FDA's attempt to conflate "analogous" with "contains" with respect to proteins also requires the word "analogous" to take on multiple, inconsistent definitions within the statutory scheme. The statutory definition of biological product uses the word "analogous" only once: "The term 'biological product' means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, *or analogous product*." 42 U.S.C. § 262(i)(1) (emphasis added). For several of those categories, FDA *has* defined what it means to be an "analogous" product—and it has defined the analogous product to include substances that *do not* contain a component that itself satisfies the category's definition.

For instance, under FDA's regulations, a product is an antitoxin only if it "contain[s] the soluble substance in serum or other body fluid of an immunized animal which specifically neutralizes the toxin against which the animal is immune." 21 C.F.R. § 600.3(h)(4). But FDA has expressly defined a product to be "analogous" to an antitoxin if it is "*intended*, irrespective of its source of origin, *to be applicable to* the prevention, treatment, or cure of disease or injuries of man through a specific immune process." *Id.* § 600.3(h)(5)(iii) (emphases added). Thus, so long as a product shares the same *function* as an antitoxin (being "applicable to the prevention treatment, or cure of diseases or injuries" through an immune process), the product can be analogous to an antitoxin without containing an antitoxin or otherwise satisfying other elements of that definition (such as "neutraliz[ing] the toxin" or being derived from "body fluid of an immunized animal"). Products can similarly be "analogous" to a virus or therapeutic serum—again, under FDA's own regulations interpreting the same statutory term at issue here—without containing a virus or therapeutic serum, and also without satisfying all elements of the definition of those terms. *See id.*

§ 600.3(h)(5)(i) (product analogous to virus if "prepared from or with a virus or agent actually or potentially infectious, without regard to the degree of virulence or toxicogenicity of the specific strain used"); *id.* § 600.3(h)(5)(ii) (product analogous to therapeutic serum "if composed of whole blood or plasma or containing some organic constituent or product other than a hormone or an amino acid, derived from whole blood, plasma, or serum").

That is fatal to FDA's position here. By adopting one definition of "analogous" for products analogous to a protein ("contains"), but a *different*, functional definition for products analogous to other protein categories, FDA would "attribute different meanings to the same [word] in the same sentence, depending on which object it is modifying." *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 329 (2000). That result is "untenable," and the Supreme Court has squarely held that courts must "refuse to adopt [such] a construction." *Id.* "In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy*, 587 U.S. at 268; *see Clark v. Martinez*, 543 U.S. 371, 386 (2005) (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases").

FDA's conclusion that retatrutide cannot be "analogous" to a protein unless it satisfies every element of the protein definition is also incompatible with the statute's structure, because it would effectively read the word "analogous" out of the statute. By creating a separate category for "analogous" products, Congress demonstrated its intention to include products that *do not* otherwise fit into the enumerated categories, including products that do not meet FDA's definition of a protein. Even if FDA is correct that the analogous category "would still perform *some* work," because it would apply to mixtures that contain proteins, "that is a small amount of work" for such a key statutory category. *City of Chicago, Ill. v. Fulton*, 592 U.S. 154, 160 (2021) (emphasis added). Requiring a product to meet all of "the agency's definitional criteria" for a protein to

qualify as analogous, AR 1936 (citation omitted), would fail to give meaningful scope to Congress's choice, and is therefore fundamentally at odds with the statute's design. *See, e.g.*, *United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 363 (7th Cir. 2010) (rejecting interpretation of False Claims Act that would "read 'related' out of the statute" by limiting it to actions involving identical—rather than merely related—facts).

FDA attempted to find support for its reading of "analogous" in *Teva Pharmaceuticals*, but that decision actually undermines its position. FDA focused on the following language from the opinion:

> FDA's stance, that a product cannot fail entirely to meet one of the agency's definitional criteria for a category of biological products yet nonetheless become a biological product, offers a reasonable method by which to distinguish sufficiently similar products from products that are too distinct to be considered analogous. The agency appears to understand the "analogous product" category as a narrow residual provision meant to accommodate products that satisfy the regulatory definitions of each category in most, if not all, regards, but are not an exact fit for whatever reason.

AR 1936 (quoting 514 F. Supp. 3d at 116). The court's statement that it is "reasonable" to treat a product as non-analogous if it "fail[s] entirely to meet one of the agency's definitional criteria" was relevant to the product at issue in *Teva Pharmaceuticals*, which "d[id] not contain any component with a 'specific, defined sequence.'" 514 F. Supp. 3d at 116. FDA had taken the position that "*the critical 'analogous' quality* is a 'specific, defined sequence' of amino acids." *Id. at 113* (quoting FDA's briefing) (emphasis added); *see id. at 115* (explaining that agency had selected "the 'specific, defined sequence' requirement as *the touchstone*" for analogous products) (emphasis added). Here, by contrast, FDA does not dispute that retatrutide possesses that "critical" quality. *See* AR 1931. Because the agency contended in *Teva Pharmaceuticals* that the presence of a specific, defined sequence was the key criterion, moreover, nothing in the court's decision addressed whether polymers containing 40 alpha amino acids and one non-alpha amino acid could qualify as analogous products. In fact, contrary to the agency's position here, the court recognized

24

that protein chains can "range in length from ~40 to over 4000 amino acid residues." 514 F. Supp. 3d at 100 n.14 (quoting *American Heritage Science Dictionary* 507 (2005)).

Having identified "a 'specific, defined sequence' of amino acids" as "the critical 'analogous' quality" in *Teva Pharmaceuticals*, *id.* at 113, the agency may not shift its position now without explanation. "At the very least, 'an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute.'" *Airmark Corp. v. FAA*, 758 F.2d 685, 692 (D.C. Cir. 1985) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). FDA made no effort to do so here. *See* AR 1935-36.

In any event, the quoted portion of *Teva Pharmaceuticals*—with its focus on whether the agency's decision was "reasonable"—relied on the now-overruled *Chevron* doctrine. *See Teva Pharm.*, 514 F. Supp. 3d at 116 (explaining that, at *Chevron* Step Two, "the narrow question" before the court was whether the agency reasonably concluded that "a product 'analogous' to a protein must have a specific, defined sequence"). Because it applied *Chevron* deference, the *Teva Pharmaceuticals* court did seek to answer the question at issue here: whether the agency has chosen "the best reading of the statute." *Loper Bright*, 603 U.S. at 400. FDA accordingly cannot rely on the decision as support for its atextual limit on the phrase "analogous product."

3.    Even if FDA's cramped definition of "analogous" could be squared with the statutory text, the agency's rationale for adopting it was nevertheless arbitrary and capricious. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024) (agency action is arbitrary and capricious unless it is both "reasonable and reasonably explained") (citation omitted). In its discussion of analogous products, the agency asserted only a single ground for categorically excluding alpha amino acid polymers

with fewer than 41 alpha amino acids: Doing so would, in its view, "defeat the purpose of the bright line rule because FDA would frequently have to evaluate on a case-by-case basis the features of a particular molecule to determine if it is analogous to a protein." AR 1935. That rationale does not withstand scrutiny.

First, it is the agency's job to make case-by-case determinations based on the relevant features of products for which a designation under the PHSA has been sought. By adopting statutory language requiring the agency to draw "analog[ies]" for products that do not fall within the enumerated categories, 42 U.S.C. § 262(i)(1), Congress expressly mandated the exact inquiry that the agency is trying to avoid. And whatever latitude FDA may receive post-*Loper* when exercising its scientific or technical judgment, it is entitled to *no* deference when adopting a statutory construction merely as a rule of convenience. Since administrative convenience is an obviously inappropriate basis for assessing whether a product is "analogous" to a protein within the statute's meaning, moreover, the agency's sole reliance on that factor in rejecting a broader test independently renders its decision arbitrary *per se*. *See State Farm*, 463 U.S. at 43.

FDA's attempt to piggyback on its own "protein" definition in determining what qualifies as an "analogous" product is particularly suspect, given that a court—not the agency—bears ultimate responsibility for the "legal interpretation" of *both* of those terms. *Loper Bright*, 603 U.S. at 403; *see id.* at 452 (Kagan, J., dissenting) (identifying the definition of "'biological product[s],' including 'protein[s]'" and analogous products, as an interpretative question that courts must now resolve under the Supreme Court's decision) (quoting 42 U.S.C. § 262(i)(1)). Nor is there any legitimate basis for an agency to narrowly construe a *statutory* term ("analogous") to conform to its own regulatory definition of a separate term ("protein"), at least absent a clear indication that Congress sought to codify or otherwise relied on the regulatory definition—and here there is none.

26

Indeed, reading the statutory definition in light of the regulatory definition would be doubly suspect here, since the regulatory definition draws an admittedly arbitrary line: As the agency itself recognized when promulgating the "protein" definition, no "clear scientific consensus" limits proteins to polymers comprising "a particular number of amino acids." 85 Fed. Reg. at 10,059. Instead, the agency adopted its "bright-line rule" for proteins largely for policy reasons, including to "facilitate[] implementation" and "provide[] regulatory clarity." *Id.* FDA's categorical determination that if a product fails to satisfy its (admittedly arbitrary) protein definition, it therefore also cannot be *analogous* to a protein, thus improperly elevates the agency's "policy preference[]" for a bright-line rule above the statute's command. *Loper Bright*, 603 U.S. at 403. Embracing such an agency determination would raise the same separation-of-powers concerns that led the Supreme Court to reject deference to agency interpretations in *Loper Bright*. *Id.* at 395-96.

For these reasons, this case stands in stark contrast to the D.C. Circuit's recent decision in *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 108 F.4th 836 (D.C. 2024). There, the court "agree[d]" with Ipsen Biopharmaceuticals' argument "that 'analogous product' includes 'analogous proteins,'" and that "any product analogous to [a protein] is a biologic." *Id.* at 845. The court nevertheless approved FDA's determination that lanreotide acetate, a polymer composed of just *eight* amino acids, was not analogous to a protein. *Id.* at 846. But "[n]otably, Ipsen d[id] not argue the FDA's decision or approach conflicts with the ordinary meaning of analogous." *Id.* That is precisely what Lilly argues here.

In *Ipsen Biopharmaceuticals*, moreover, the D.C. Circuit relied on FDA's representation that it "will make case-by-case determinations" about whether particular products share "critical characteristics" with proteins. *Id.* But FDA has insisted on doing the opposite here: It has rejected retatrutide under its "bright line" rule to *avoid* "frequently hav[ing] to evaluate on a case-by-case

basis the features of a particular molecule to determine if it is analogous to a protein." AR 1935. That "bright line" rule conflicts with the statute's text and, on FDA's own telling, rests on considerations of convenience, *not* any supposed "scientific expertise." *Ipsen Biopharmaceuticals*, 108 F.4th at 846; *see* AR 1935. Indeed, nothing in FDA's decision about whether retatrutide is analogous to a protein purports to involve *any* scientific analysis—just a bare legal conclusion that *no* "alpha amino acid polymers with fewer than 41 alpha amino acids" may *ever* qualify as "analogous" to a protein. *See* AR 1935-36. Such a "legal interpretation" deserves no deference. *Loper Bright*, 603 U.S. at 403. Instead, applying "the traditional tools of statutory construction," *id.*, the Court should give "analogous product" its ordinary meaning and set the agency's interpretation aside.

### C.    No Remand Is Warranted

If the Court determines that FDA's designation decision was unlawful, it should set the designation aside and order the agency to designate retatrutide as a biological product, without remanding to the agency. The APA requires courts to "hold unlawful and set aside" arbitrary and capricious agency action, 5 U.S.C. § 706(2), and "vacatur is the presumptive remedy for a violation of the Administrative Procedure Act," *Johnson v. OPM*, 783 F.3d 655, 663 (7th Cir. 2015). Remand to the agency would be particularly inappropriate here for two reasons.

First, there is no meaningful possibility that the agency could lawfully reach the same conclusion on remand by providing additional reasoning. FDA is bound to adhere to its existing regulatory protein definition, which retatrutide plainly satisfies as an alpha amino acid polymer of a specific, defined sequence greater than 40 amino acids in size. 21 C.F.R. § 600.3(h)(6). Nor is there any permissible reading of "analogous" that would exclude a product with identical structural and functional characteristics to a protein, solely because one of its 41 amino acids is not an alpha amino acid. The key questions here are matters of pure legal interpretation, moreover, on which

FDA receives no deference. *See Loper Bright*, 603 U.S. at 399, 403. The agency's decision is thus unsupportable independent of its reasoning; remand would accomplish nothing except delay.

Second, the PHSA's statutory deadline to resolve a request for designation precludes any further agency deliberation on this issue. In the PHSA, Congress directed FDA to resolve a classification request "[n]ot later than 60 days after the receipt of the request." 21 U.S.C. § 360bbb-2(b). This statutory command, which twice uses "shall," is mandatory and non-extendable. *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 865 (7th Cir. 2020) ("This court (like others) has consistently interpreted 'shall' as mandatory language."). And the statute further specifies that the agency's failure to comply with the deadline automatically results in acceptance of the requested classification. 21 U.S.C. § 360bbb-2(c). Under that rule, because the 60-day deadline has lapsed without FDA "determin[ing] the classification of the product" through any valid agency action, "the recommendation made by [Lilly] shall be considered to be a final determination" of retatrutide's status as a biological product. *Id.* § 360bbb-2(b), (c). The agency does not get another attempt to identify an alternative theoretical justification for its designation decision now that the deadline has long since passed.

Congress's decision to impose a mandatory deadline, and to deem the agency's failure to timely act as acceptance of the requested classification, reflect the significant burdens that delay imposes on the development of new medicines. Marketing applications for drugs and biological products require significantly different supporting data. *Compare* 42 U.S.C. § 262(a) (licensure standards for biologics license applications), *and* 21 C.F.R. § 601.2 (procedures and content requirements for biologics license applications), *with* 21 U.S.C. § 355(d) (approval standards for new drug applications), *and* 21 C.F.R. § 314.50 (content requirements and procedures for new

drug applications). A product's sponsor thus must know the type of application it will be required to file far in advance of submission to begin its preparations.

Affording FDA another opportunity to review this issue would also create perverse incentives—encouraging the agency to hold potential arguments in reserve, so that the agency can deploy them on remand after an unfavorable judicial decision. That would thwart the statute's design (and the statutory deadline), costing sponsors significant resources and depriving the public of prompt access to new medicines. Both the PHSA's unambiguous text and the interests it embodies foreclose this sort of piecemeal litigation. Instead of giving FDA another bite at the apple, the Court should fully resolve this dispute and permit Lilly to proceed with a biologics license application without further delay.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of Lilly, set aside FDA's unlawful designation decision, and enter an injunction requiring FDA to designate retatrutide as a biological product.

Dated: January 28, 2025                          Respectfully submitted,

*Jayna M. Cacioppo*
Jayna M. Cacioppo, Attorney No. 25514-49
Donald Morgan, Attorney No. 30776-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Ph. No. (317) 713-3500
Fax No. (317) 713-3699


Allon Kedem (pro hac vice)
Jeffrey L. Handwerker (pro hac vice)
Daniel Yablon (pro hac vice)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
daniel.yablon@arnoldporter.com

*Counsel for Plaintiff Eli Lilly and Company*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2025, a copy of the foregoing *Plaintiff's Brief in Support of Motion for Summary Judgment* was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*Jayna M. Cacioppo*
Jayna M. Cacioppo
