**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

ELI LILLY AND COMPANY,

        *Plaintiff*,

    v.

ROBERT F. KENNEDY, JR., in his official
capacity, *et al.*,

        *Defendants*.

Case No. 1:24-cv-01503-TWP-KMB

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

OF COUNSEL:

SEAN R. KEVENEY
Acting General Counsel

ROBERT F. FOSTER
Deputy General Counsel
U.S. Department of Health and Human
Services
Chief Counsel for Food, Research, and Drugs

WENDY S. VICENTE
Deputy Chief Counsel, Litigation

BARBARA ALKALAY
Senior Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
White Oak 32, Room 4520
Silver Spring, MD 20993-0002

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Deputy Director, Civil Litigation

JAMES W. HARLOW
Acting Assistant Director

SCOTT P. KENNEDY
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 305-1837
(202) 514-8742 (fax)
Scott.P.Kennedy@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................. 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ............................................ 2

   I.   Statutory and Regulatory Background ........................................................ 2

      A.   Drug Products and Biological Products ................................................ 2

      B.   FDA's Regulatory Definition of "Protein" ........................................ 3

      C.   Requests for Designation of a Product as a Drug or Biologic ............. 5

   II.   Factual Background ................................................................................. 5

      A.   Lilly's Request for Designation ......................................................... 5

      B.   FDA's Designation Letter ................................................................. 6

      C.   Lilly's Lawsuit ................................................................................. 9

LEGAL STANDARD .............................................................................................. 9

ARGUMENT ........................................................................................................ 10

   I.   FDA Reasonably Determined That Retatrutide Is Not A Protein .................. 10

      A.   The Regulatory Definition's Text, Context, And History Show That Only Alpha Amino Acids Count Toward The Greater-Than-40 Threshold. ................................. 10

         1.   FDA's regulatory definition of "protein" controls in this case. ............... 10

         2.   FDA's determination is supported by the regulatory definition's text. ................... 12

         3.   FDA's determination that retatrutide is not a protein is also supported by the history of the regulatory definition ..................................................... 14

      B.   FDA's Application Of Its Regulatory Definition To Retatrutide Is Further Supported By The Agency's Scientific Reasoning. ...................................................... 16

      C.   Lilly's Contrary Arguments Misread The Regulatory Definition, Ignore Its History, And Contradict Broadly Accepted Scientific Principles .............................. 17

   II.   FDA Also Reasonably and Lawfully Determined That Retatrutide Is Not Analogous To A Protein ........................................................................................ 24

   III.   Vacatur And Remand Would Be The Only Appropriate Remedy. .................. 29

CONCLUSION ...................................................................................................... 30

**Cases**

*Actavis Elizabeth LLC v. U.S. FDA*,
  625 F.3d 760 (D.C. Cir. 2010) ................................................................................. 29

*Atlantis Exp., Inc. v. Standard Transp. Servs., Inc.*,
  955 F.2d 529 (8th Cir. 1992) ................................................................................. 11

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ................................................................................................ 17

*Carr v. Saul*,
  593 U.S. 83 (2021) ................................................................................................ 24

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .............................................................................................. 12

*City of Columbus v. Ours Garage & Wrecker Serv.*, Inc.,
  536 U.S. 424 (2002) .............................................................................................. 19

*Clay v. United States*,
  537 U.S. 522 (2003) ........................................................................................ 18, 19

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) .............................................................................................. 21

*ExxonMobil Gas Mktg. Co. v. FERC*,
  297 F.3d 1071 (D.C. Cir. 2002) ............................................................................. 29

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .................................................................................. 10, 17, 26

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
  423 U.S. 326 (1976) .............................................................................................. 30

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) .............................................................................................. 30

*Gendron v. United States*,
  154 F.3d 672 (7th Cir. 1998) ................................................................................. 19

*Genus Med. Techs., LLC v. FDA*,
  427 F. Supp. 3d 74 (D.D.C. 2019) ......................................................................... 31

*GMS Mine Repair v. Fed. Mine Safety & Health Review Comm'n*,
  72 F.4th 1314 (D.C. Cir. 2023) ........................................................................ 15, 16

*Grand Trunk W. R.R. Co. v. United States Dep't of Lab.*,
  875 F.3d 821 (6th Cir. 2017) ................................................................................. 19

*Heather S. by Kathy S. v. Wisconsin*,
  125 F.3d 1045 (7th Cir. 1997) ............................................................................... 10

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
  108 F.4th 836 (D.C. Cir. 2024) ....................................................................... passim

*Johnson v. United States*,
559 U.S. 133 (2010) ...................................................................... 13, 21

*King v. Moore*,
312 F.3d 1365 (11th Cir. 2002) ....................................................... 13

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ......................................................... 15, 17, 18

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..............................................................passim

*Maslenjak v. United States*,
582 U.S. 335 (2017) ........................................................................ 13

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ................................................. 23, 29

*NLRB v. Wyman-Gordon Co.*,
394 U.S. 759 (1969) ........................................................................ 27

*Palisades Gen. Hosp. Inc. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005) ....................................................... 30

*Pearce v. U.S. Dep't of Labor*,
647 F.2d 716 (7th Cir. 1981) .......................................................... 11

*Prevor v. FDA*,
67 F. Supp. 3d 125 (D.D.C. 2014) .................................................. 31

*Pulsifer v. United States*,
601 U.S. 124 (2024) ................................................................. 13, 21

*RJMC Farms, LLC v. Vilsack*,
661 F. Supp. 3d 826 (S.D. Ind. 2023) ............................................ 10

*Russello v. United States*,
464 U.S. 16 (1983) ................................................................... 18, 19

*Sandoz Inc. v. Amgen Inc.*,
582 U.S. 1 (2017) .................................................................... 3, 5, 10

*Smith v. MHI Injection Molding Mach., Inc.*,
972 F. Supp. 2d 1049 (N.D. Ill. 2013) ................................. 14, 22, 23

*Spam Arrest LLC v. Rhino Software*, *Inc.*,
No. 10-CV-669-WMC, 2011 WL 13267041 (W.D. Wis. Nov. 16, 2011) .............................. 13

*Suncor Energy, Inc. v. EPA*,
50 F.4th 1339 (10th Cir. 2022) ....................................................... 11

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) ........................................................................ 14

*Terry v. Astrue*,
580 F.3d 471 (7th Cir. 2009) .......................................................... 11

iii

*Teva Pharms. USA, Inc. v. FDA*,
514 F. Supp. 3d 66 (D.D.C. 2020) ............................................... 9, 12, 26, 28

*Union Pac. R.R. Co. v. Pipeline & Hazardous Materials Safety Admin.*,
953 F.3d 86 (D.C. Cir. 2020) ................................................................ 22

*United States v. Boler*,
115 F.4th 316 (4th Cir. 2024) ......................................................... 15, 21

*United States v. Gonzales,*
520 U.S. 1 (1997) ....................................................................... 20

**Statutes**

5 U.S.C. §
706(2) ......................................................................... 9, 17, 30
06(2)(A) ............................................................................. 10

21 U.S.C. §
321(g)(1) ............................................................................ 4
360bbb-2(a) .......................................................................... 6
360bbb-2(b) .......................................................................... 6
371(a) ............................................................................. 12

42 U.S.C. §
262 ................................................................................ 4
262(a)(2)(A) ..................................................................... 12, 15
262(i)(1) ......................................................................... 4, 7, 15
262(j) .............................................................................. 4

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, 133 Stat. 2534 (2019) ....... 4

**Regulations and Rules**

21 C.F.R. §
3.7 ................................................................................ 6
3.8 .............................................................................. 6, 7
10.45(f) ............................................................................ 24
600.3(h)(6) ...................................................................... passim

Fed. R. Civ. P. 56 ................................................................... 10

In 2010, Congress added "protein" as a category of biological product in the Public Health Service Act ("PHSA") without defining the term or offering any guidance about what it means. So the agency Congress charged with regulating biological products—the U.S. Food and Drug Administration ("FDA")—spent the next decade developing a definition based on extensive public input before promulgating, through notice-and-comment rulemaking, a regulatory definition. It states, in pertinent part, that a protein is an "alpha amino acid polymer . . . greater than 40 amino acids in size." Throughout that definition's development, the agency repeatedly and unequivocally stated that it was based, in part, on a broad scientific consensus that *alpha* amino acids, which are the building blocks of proteins in nature, are the units that count for determining whether a product is a protein. And at *that* time, Plaintiff Eli Lilly and Company ("Lilly") agreed: it repeatedly told FDA that, according to Lilly's understanding of the scientific literature, a protein consists of *alpha* amino acids.

Nonetheless, Lilly now argues that because FDA did not repeat the "alpha" modifier after the first reference to "amino acid" in its regulatory definition, alpha amino acids are not the only units that count toward the "greater than 40" requirement. Instead, according to Lilly, a product can be a "protein" if it includes just *one* alpha amino acid so long as it has 40 or more other units, which may include any of the hundreds of amino acids in nature and an almost limitless number of other chemically synthesized compounds. Based on this improbable reading of FDA's regulatory definition, Lilly claims that its product, retatrutide—which consists of *less* than 41 alpha amino acids—satisfies the regulation's "greater than 40" requirement.

Lilly's argument fails because it would have the Court read the phrase "greater than 40 amino acids" in isolation, and assign to it the broadest possible meaning, while ignoring the rest

1

of the regulation's text, its history and context, and the underlying scientific consensus. The company misapplies a single interpretive canon while ignoring the more fundamental maxim that context determines meaning. Here, context shows that, in the regulatory definition, FDA did not repeat "alpha" after the first use of "amino acid" because the modifier was implied in subsequent uses. And any scientist reading the regulatory definition would understand that. Indeed, Lilly has employed the same principle: in past submissions to the agency, the company has dropped the "alpha" modifier when context shows it was referring to alpha amino acids.

Lilly's alternative argument, which suggests FDA is statutorily obligated to find that retatrutide is *analogous* to a protein, fares no better. Congress provided that a product which is "analogous" to a "protein" can also be regulated as a biological product, but it did not define what it means to be analogous to a protein. With no guidance from Congress, FDA properly relied on its scientific and regulatory expertise in applying that statutory term to retatrutide. And it reasonably determined that, because the product lacks one of the fundamental, defining features of a protein, it is too fundamentally unlike a protein to be analogous to one. Multiple courts have reviewed, and upheld, the rationale on which FDA relied in reaching that decision. And those courts have rejected most of the arguments now advanced by Lilly. The company's alternative claim therefore fails. For all these reasons, Defendants' cross-motion for summary judgment should be granted, and Lilly's motion denied.

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

## I.   Statutory and Regulatory Background

### A.  Drug Products and Biological Products

This case concerns the statutory and regulatory schemes governing drug products, which are approved under the Federal Food, Drug, and Cosmetic Act ("FDCA"), and biological

products, which are licensed under PHSA. A traditional drug product is typically synthesized from chemicals; a biological product, or "biologic," is typically derived from natural biological sources, such as animals or microorganisms. *See Sandoz Inc. v. Amgen Inc*., 582 U.S. 1, 5-7 (2017).[1] Lilly contends that its product should be classified as a biologic rather than as a drug.

The PHSA defines "biological product" as "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product[] . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). Before 2010, that definition did not include "protein," but then Congress amended it to include "protein (except any chemically synthesized polypeptide)." *See id*. § 262(i)(1) (2012). Congress later struck the parenthetical. *See* Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. N, § 605, 133 Stat. 2534, 3127 (2019).

The FDCA defines "drug," in pertinent part, as an "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man." 21 U.S.C. § 321(g)(1). Most biological products regulated under 42 U.S.C. § 262 are also "drugs" generally subject to requirements under the FDCA, except that a biological product approved under the PHSA does not additionally need to be approved under the FDCA. 42 U.S.C. § 262(j). Thus, the approval pathways for drug products and biological products have much in common: most basically, both must be shown to be safe and effective for their proposed use(s) with valid scientific evidence.

## B. FDA's Regulatory Definition of "Protein"

Because Congress did not define "protein" in the PHSA, FDA promulgated a regulation through notice and comment rulemaking to fill the gap. That regulation defines "protein" as an

---

[1] Except where otherwise noted, in all quotations, emphases have been added, and internal quotation marks, citations, and alteration marks have been omitted.

"alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). And "[w]hen two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer" for purposes of this definition is "based on the total number of amino acids in those chains . . . ." *Id*. Lilly has not directly challenged the validity of that regulation. *See* Compl. (ECF No. 1) ¶¶ 94-107 (alleging that FDA's determination violated both the PHSA and the regulation, but not that the regulation is unlawful).

In developing this definition, FDA gathered extensive public input and analyzed the scientific literature. Prior to the rulemaking, it held a public hearing and invited comments on draft guidance. *See generally* Revised Certified Index to the Administrative Record (ECF No. 29) at 1-5 (describing sources of input). It then invited additional comments in the rulemaking. *See id.* at 5-7. In analyzing the literature, FDA observed that while "scientific sources disagree on many aspects" of what constitutes a protein, "most, if not all, sources agree" that proteins, which originate from living organisms, consist of "amino acid polymers ('chains') made up of *alpha* amino acids linked by peptide bonds." FDA-795;[2] *see also* FDA-1810 (preamble to FDA's final rule defining "protein," stating the same). Thus, according to the term's "generally accepted meaning[]" among scientists, "[p]roteins are long, complex polymers of *alpha* amino acids." FDA-795; *see also* FDA-826 (explaining that FDA's definition was "informed by . . . [t]he scientific literature," which "described a protein as a defined sequence of *alpha* amino acid[s]"). FDA's final regulatory definition tracked this consensus by specifying that a protein is an "alpha amino acid polymer . . . greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6).

---

[2] "An alpha amino acid" is distinct from other kinds of amino acids because it "is an amino acid in which there is only one carbon atom between an amino group and a carboxy[l] group," and it is "the building block[] for all proteins found in nature." FDA-1931.

Lilly's efforts to influence FDA's development of a regulatory definition similarly evince a consensus that proteins consist of alpha amino acids. In a 2014 comment, Lilly asserted that "[b]ased on [its] review of the scientific literature . . . [a] 'protein' is a linear polymer of *alpha*[3] amino acids . . . ." FDA-1318. The remainder of that submission makes clear that, while Lilly disagreed with FDA on certain aspects of the agency's then-tentative definition—such as whether it should specify a "precise number of amino acids" as a threshold requirement—there was no disagreement that a protein consists of alpha amino acids. *See id*. And in a 2016 Citizen Petition to FDA, Lilly again argued that, under both "the PHSA and [the] scientific understanding of the term," a protein is a "linear polymer of *alpha* amino acids . . . ." AR-1370.

### C. Requests for Designation of a Product as a Drug or Biologic

The sponsor of an application seeking FDA's approval to market a new product "may submit a request" to the agency seeking "classification of the product as a drug" or "biological product." 21 U.S.C. § 360bbb-2(a). FDA calls this a "request for designation." 21 C.F.R. § 3.7. After receiving such a request, FDA will "determine the classification of the product . . . or the component of [FDA] that will regulate the product" and provide its "reasons for such determination." 21 U.S.C. § 360bbb-2(b). That determination is set forth in a "letter of designation." 21 C.F.R. § 3.8.

## II.  Factual Background

### A. Lilly's Request for Designation

Lilly is the sponsor of an Investigational New Drug Application for retatrutide. FDA-1905. Its proposed uses include the treatment of chronic weight management. FDA-1908.

---

[3] Lilly's comment, like many scientific publications, used the Greek letter for "alpha" followed by a hyphen ("α-amino acids"). In all quotations, for readability and consistency, "alpha" is substituted for the Greek letter and hyphen.

According to Lilly, retatrutide is "an alpha amino acid polymer" with "a specific, defined sequence of 41 amino acids cumulatively." FDA-1905. Those 41 amino acids include "a backbone of 39 alpha amino acids" as well as "a second (associated) chain" with one residue of "gamma-glutamate" and another of "ADO (also known as "8-amino-3, 6-dioxaoctanoic acid"). FDA-1905. Lilly submitted a request for designation on November 9, 2023. AR-1875. After FDA requested more information, Lilly submitted a new, superseding request to designate retatrutide as a biological product on January 19, 2024. FDA-1904 ("Request for Designation").

Lilly's Request for Designation argued that retatrutide is a "protein," and therefore, a biological product. First, the company argued that retatrutide is a "protein within the ordinary meaning of the word" because, among other things, its "molecular structure is far more complex than that of" a typical drug. FDA-1913. Second, Lilly argued that retatrutide satisfies FDA's regulatory definition of a protein because it is an "alpha amino acid polymer that is greater than 40 amino acids in size." FDA-1907. Though Lilly recognized that FDA might consider ADO to be a "non-alpha" amino acid, the company argued that non-alpha amino acids should count toward the total in the regulatory definition because FDA did not repeat the word "alpha" in the phrase "40 amino acids" or thereafter. FDA-1914. Thus, the company concluded that retatrutide meets the regulation's size requirement because it consists of "41 *total* amino acids." *Id.* Lilly argued in the alternative that retatrutide is an "analogous product" to a protein under 42 U.S.C. § 262(i)(1) because the "vast majority" of retatrutide's amino acids are alpha amino acids, and it also "shares structural and functional characteristics in common with a protein." FDA-1917.

### B. FDA's Designation Letter

After considering Lilly's arguments, FDA rejected them in a letter dated March 18, 2024 and determined that retatrutide should be regulated as a drug, not as a biological product. FDA-

1928 ("Designation Letter"). The agency began by applying its regulatory definition of "protein." FDA-1931. The agency "assume[d]" four issues for its analysis "without conceding" them: that retatrutide has a specific, defined sequence; that its primary 39-amino-acid chain is associated "in a manner that occurs in nature" with its second chain of gamma glutamate and ADO; that gamma glutamate is an alpha amino acid; and that ADO is an amino acid. *Id*. The agency's analysis was therefore focused on the regulation's greater-than-40 requirement. And it concluded that retatrutide could not satisfy that requirement because "it is not composed of more than 40 alpha amino acids." FDA-1931. Specifically, the agency reasoned that "[e]ven if" ADO is an amino acid, it "is not an *alpha* amino acid because it does not contain an amino group and a carboxylic acid group separated by a single carbon, called the alpha carbon." FDA-1932.

The agency disagreed with Lilly's argument that non-alpha amino acids can count toward the greater-than-40 threshold, and it offered several reasons why. FDA first applied an ordinary principle of English grammar to the text of the regulatory definition: it explained that there was no need for the regulation to "repeat the 'alpha' modifier each time the definition uses the term amino acid" because the modifier was used "at the beginning of the definition" and implied thereafter. *Id.* FDA bolstered this reading by discussing why a scientist with the relevant expertise would read the definition that way: "[i]t is common scientific knowledge," FDA explained, "that proteins are composed of alpha amino acids," not other kinds of amino acids. The agency supported this assertion by citing as "example[s]" multiple "textbooks describ[ing] that alpha amino acids are the building blocks for *all* proteins found in nature." FDA-1931; FDA-1932, n.12-15, 17 (citing five textbook entries). [4] Thus, as one of those textbooks put it,

---

[4] The textbooks FDA cited in this passage are available at FDA-1676-81 (Molecular Biology of the Cell); FDA-1645-48 (Biochemistry 5th Ed.); FDA-1937-41 (Handbook of Hormones); 1942-

"[i]n most contexts, the term 'amino acids' refers to alpha amino acids." FDA-1942. The agency

further explained that, "[a]lthough more than 300 amino acids exist in nature," the proteins in the

human body "are synthesized almost exclusively from 20 alpha amino acids." FDA-1931-32.

FDA therefore concluded—based both on the regulatory definition's text and on the scientific

principles that underlie the text—that "alpha amino acids are the only relevant amino acids for

determining whether something is a protein." FDA-1932.

FDA also addressed and rejected Lilly's remaining arguments. Among other things, it

found that retatrutide is also not analogous to a protein under the PHSA. FDA invoked the

agency's settled position that "it would not be appropriate for the statutory term 'analogous

product' to be interpreted" to "include products that are *specifically excluded* by" the regulatory

definition of "protein." FDA-1935. The agency emphasized that this precise rationale has been

tested by judicial review and deemed, in multiple cases, to be "a reasonable method by which to

distinguish sufficiently similar products from products that are too distinct to be considered

analogous." FDA-1936 (quoting *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106

(D.D.C. 2020)). Indeed, as the *Teva* court approvingly explained, FDA "understands the

'analogous product' category" of the PHSA "as a narrow residual provision meant to

accommodate products that satisfy the regulatory definitions of each category in most, if not all,

regards, but are not an exact fit for whatever reason." FDA-1936 (quoting 514 F. Supp. 3d at

106). Applying this principle here, FDA concluded that "being greater than 40 alpha amino acids

is a fundamental, defining property of a protein, which retatrutide does not have." FDA-1936. It

is therefore not analogous to a protein. *Id.*

---

44 (Brenner's Encyclopedia of Genetics); FDA-1945-53 (Encyclopedia of Biological
Chemistry).

### C. Lilly's Lawsuit

Lilly filed this lawsuit on September 3, 2024. Compl. (ECF No. 1). The company challenges FDA's determination that retatrutide is neither a "protein" nor an "analogous product." *Id.* Specifically, Lilly claims under 5 U.S.C. § 706(2) of the Administrative Procedure Act ("APA") that these determinations, as set forth in FDA's Designation Letter, contravene both the PHSA and the agency's regulatory definition of "protein," and that they are otherwise arbitrary and capricious. *Id.* at ¶¶ 94-107. While § 706(2) permits a court to "hold unlawful and set aside" certain agency actions, Lilly's requested relief goes further, seeking "an injunction requiring Defendants to designate retatrutide as a biological product." *Id.* at 28 (Prayer for Relief). Lilly filed its motion for summary judgment on January 28, 2025. ECF Nos. 25, 26. Defendants now oppose that motion and make their own cross-motion for summary judgment.

## LEGAL STANDARD

In reviewing agency action under the APA, "the summary judgment standard in Federal Rule of Civil Procedure 56 does not apply," and a district court does not engage in fact finding. *RJMC Farms, LLC v. Vilsack*, 661 F. Supp. 3d 826, 832 (S.D. Ind. 2023). Rather, "the district court acts as an appellate tribunal," and summary judgment "is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record" in accordance with the APA standard of review. *Id.* (citing *Heather S. by Kathy S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)).[5] Here, that standard asks whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[5] Defendants have therefore excluded the "Statement of Material Facts in Dispute" ordinarily called for in Local Rule 56-1(b). That statement is unnecessary because "the facts have already been determined by the agency, which means the entire case on review is a question of law." *RJMC Farms*, 661 F. 3d at 832.

In applying that standard to agency adjudications, like FDA's Designation Letter, a court's review of the agency's decision-making is "deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, "a court may not substitute its own policy judgment for that of the agency," but instead, ensures that the agency "acted within a zone of reasonableness" and "reasonably explained" its decision. *Id.* However, in construing the language of a statute, a court must determine the "single, best meaning" of the provision at issue. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). That means courts "must exercise their independent judgment" in deciding "whether an agency has acted within its statutory authority." *Id.* at 412.

ARGUMENT

## I.  FDA Reasonably Determined That Retatrutide Is Not A Protein

### A.  The Regulatory Definition's Text, Context, And History Show That Only Alpha Amino Acids Count Toward The Greater-Than-40 Threshold.

Because FDA has promulgated a regulation defining "protein," that definition controls in this case. And in stating that a protein is an "alpha amino acid polymer . . . greater than 40 amino acids in size," the regulation is properly read to mean that only alpha amino acids count toward the definition's size requirement. This conclusion becomes inescapable when the definition is read as a scientist would read it, particularly considering the regulation's history. FDA therefore properly applied its regulatory definition in determining that retatrutide is not a protein.

#### 1.  FDA's regulatory definition of "protein" controls in this case.

As a threshold matter, the PHSA does not define "protein," so FDA's regulatory definition of that term controls. "[R]egulations promulgated pursuant to statutory authority have the force and effect of law," so an agency—like the regulated public—"is bound by" those regulations. *Pearce v. U.S. Dep't of Labor*, 647 F.2d 716, 726 (7th Cir. 1981); *see also Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009) (similar); FDA-1916 (Lilly, asserting as "blackletter

law" that "agencies are bound" by their regulations). This principle extends to a "regulatory definition" promulgated through notice-and-comment, which similarly "carr[ies] the force of law." *Suncor Energy, Inc. v. EPA*, 50 F.4th 1339, 1352-53 (10th Cir. 2022). Such "[r]egulations continue to have the force of law unless they are" overturned by a court or repealed. *Atlantis Exp., Inc. v. Standard Transp. Servs., Inc*., 955 F.2d 529, 534 n.9 (8th Cir. 1992).

The Supreme Court's decision in *Loper Bright* did not alter these principles. To the contrary, it recognized that Congress "often" enacts statutes with broad legislative language that "empower[s]" an agency "to prescribe rules to fill up the details of a statutory scheme." 603 U.S. at 395; *see also* 21 U.S.C. § 371(a); 42 U.S.C. § 262(a)(2)(A) (delegating to FDA broad authority to promulgate regulations under the FDCA and PHSA). That is precisely what FDA did in defining "protein"—a term that, as Lilly has acknowledged, Congress did not define. *See* FDA-1319 (adding that "the legislative history" also does not "elucidate this language"). FDA's regulatory definition of "protein" has also been upheld as lawful. *Teva*, 514 F. Supp.3d at 97-106. And contrary to Lilly's assertion (Pl. Mem. 1, 3, 9, 26), the dissent in *Loper Bright* never suggested that case's holding would nullify FDA's now-settled definition. *See* 603 U.S. at 452.[6]

All of this belies Lilly's argument that the meaning of "protein" under the PHSA is purely "a question of statutory interpretation for the courts." Pl. Mem. 3. Thus, Lilly's claim that FDA violated *the PHSA* by failing to classify retatrutide as a protein, Compl. ¶¶ 94-97, fails. The question is whether FDA reasonably applied its regulatory definition of "protein" in reviewing Lilly's Request for Designation. And as discussed below, it plainly did.

---

[6] To the contrary, in "overruling" *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984), *Loper Bright*'s majority explicitly did "not call into question prior cases," like *Teva*, "that relied on the *Chevron* framework." 603 U.S. at 376.

## 2. FDA's determination is supported by the regulatory definition's text.

FDA properly applied its regulatory definition in determining that retatrutide is not a protein. The regulation states that a protein is an "alpha amino acid polymer . . . greater than 40 amino acids in size," 21 C.F.R. § 600.3(h)(6). Properly read, that text means that only *alpha* amino acids count toward the size threshold. Several considerations support this conclusion.

"Ultimately, context determines meaning." *Johnson v. United States*, 559 U.S. 133, 139 (2010). Therefore, in construing language, courts look for "[t]he most natural understanding" of the "whole phrase" or sentence at issue. *Maslenjak v. United States*, 582 U.S. 335, 342 (2017). The rules and conventions of "ordinary usage" and grammar necessarily inform that understanding. *Id.*

When drafting the regulatory definition, FDA found it "[un]necessary" to "repeat the 'alpha' modifier each time [it] uses the term amino acid." FDA-1932. Instead, FDA used a "routine aspect of expression," which holds that "an introductory" word or phrase can implicitly "apply to, or modify, several terms coming after it" without being repeated. *Pulsifer v. United States*, 601 U.S. 124, 134 (2024). "[W]hether a speaker intends for a listener to distribute words implicitly depends on the context" and the "relevant background understandings" of the parties. *Id*. at 140-41. In other words, modifiers need not always be explicit – context sometimes renders them implied. *See, e.g., King v. Moore*, 312 F.3d 1365, 1367 (11th Cir. 2002) (holding that "the word 'federal' is an implied modifier for 'proceedings'" in a statutory provision); *Spam Arrest LLC v. Rhino Software, Inc.*, No. 10-CV-669-WMC, 2011 WL 13267041 (W.D. Wis. Nov. 16, 2011) ("The context . . . makes clear that" the "modifier" is "implied.").

This principle is intuitive. If an engineer defined a "chain" as a "metal apparatus with at least 5 links, all of which are connected in a series," most would understand that only *metal* links

count—one made of string would not. The parties' "relevant background understandings," *Pulsifier*, 601 U.S. at 134, matter too: if the engineer's definition was written on architectural drawings intended for a professional contractor, and the chain was meant to bear heavy weight, common knowledge in those professions would make any reading that provided for non-metal links particularly implausible. If someone argued otherwise by quibbling with the definition's failure to repeat the modifier ("metal"), the engineer might respond, "that's the kind of argument that only a lawyer would make." *Smith v. MHI Injection Molding Mach., Inc*., 972 F. Supp. 2d 1049, 1052 (N.D. Ill. 2013). So too here. By specifying that a "protein" is an "alpha amino acid polymer . . . greater than 40 amino acids in size," *See* 21 C.F.R. § 600.3(h)(6), the regulatory definition most naturally reads that only *alpha* amino acids count toward the total.

The relevant background understandings of scientists in biochemistry and medicine reinforce that reading. That is where FDA's invocation of "common scientific knowledge" about the composition of proteins comes in. FDA-1932-33 & n. 12-15, 17. When construing technical terms and phrases, courts try to understand them from the perspective of their intended audience: that of professionals versed in the relevant technical literature. *See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 571 (2012) (looking to the "relevant professional literature" to ascertain the meaning of "references to technical terminology in" a statute). As FDA recognized in drafting the regulation, it is a literal textbook-principle that "[i]n most contexts, the term 'amino acids' refers to the alpha amino acids." FDA-1942; *see also* FDA-1679-80 (a textbook identifying the 20 alpha amino acids of which proteins are made and then referring to them as "amino acids" without the "alpha" modifier); FDA-1655 (similar). Thus, while the presence of the "alpha" modifier before the first occurrence of "amino acid" in the regulatory definition is a

meaningful cue, its absence before the next occurrence of "amino acid" cannot reasonably be construed to signal a different meaning.

Other contextual and scientific considerations further reinforce this conclusion. Specifically, in construing and applying its regulatory definition, FDA emphasized that "*alpha* amino acids are the building blocks for all proteins found in nature," including in "humans." FDA-1931-32 and n. 12-15, 17; *see also* FDA-1940. This fact has interpretive salience because FDA's regulation does not define "protein" in the abstract, but rather, as a category of biological products intended for the treatment "*of human beings*." 42 U.S.C. § 262(i)(1). The definition was therefore based on proteins in nature, and especially those in humans. *See, e.g.,* FDA-1613 (discussing "naturally occurring proteins") FDA-1678 (describing the role of proteins in cells).

These principles of expression and science should come as no surprise to Lilly because it has also used the unmodified term "amino acids" as shorthand for "alpha amino acids." In a comment to the agency about the proposed definition, Lilly stated without qualification that "based on [its] review of the scientific literature," a "protein is a linear polymer of *alpha* amino acids . . . ." FDA-1318. In the very next sentence, however, Lilly dropped the "alpha" modifier in asserting that the "scientific literature" also "shows that there is no precise number of amino acids" that can distinguish among a peptide, a polypeptide, and a protein. *Id.* Indeed, after having asserted its view that proteins consist only of alpha amino acids, Lilly repeatedly referred to those amino acids without repeating the modifier. *See* FDA-1318-22.

3. **FDA's determination that retatrutide is not a protein is also supported by the history of the regulatory definition.**

When construing a regulation, courts must "consider not only the text but also the history and purpose of [that] regulation." *United States v. Boler*, 115 F.4th 316, 326 (4th Cir. 2024) (citing *Kisor v. Wilkie*, 588 U.S. 558, 590-91 (2019)); *see also GMS Mine Repair v. Fed. Mine*

*Safety & Health Review Comm'n*, 72 F.4th 1314, 1322 (D.C. Cir. 2023) (citing the preamble to a regulation to show the agency "anticipated the issue" in litigation) (cleaned up). Here, the public history of FDA's regulatory definition leads inescapably to the conclusion that—consistent with the regulation's text—only alpha amino acids count toward the greater-than-40 requirement.

First, FDA's statements throughout its development of the definition show that this was what it meant. In a 2011 memorandum setting forth FDA's working definition of "protein" shortly after Congress added it as a category of biological product, FDA noted that "all amino acids that are constituents of proteins are *alpha* amino acids . . ." FDA-791. That memorandum went on to note that, while "scientific sources disagree" on aspects of what a protein is, "most, if not all, sources agree" that proteins are "made up of *alpha* amino acids." *Id.* A 2015 FDA guidance document describing the factors that "informed" FDA's definition similarly explained that "the scientific literature describes a 'protein' as a defined sequence of *alpha* amino acid polymers linked by peptide bonds." FDA-1350; *see also* FDA-826 (FDA draft guidance document saying the same). And in the preamble of the final regulatory definition, FDA stated unequivocally that a protein is "made up of *alpha* amino acids that are linked by peptide bonds." FDA-1810; *see also* 1621 (preamble to the proposed rule, similarly noting "proteins are long, complex polymers of *alpha* amino acids).

Second, input FDA received on its regulatory definition from the pharmaceutical industry also supports the conclusion that only alpha amino acids count toward the greater-than-40 threshold. For example, Pfizer Company, Inc., was *critical* of the fact that FDA's definition only counts alpha amino acids. The company's publicly available comment cautioned that FDA's regulatory definition "does not account" for "borderline" products that "include *non*-alpha amino acid residues." FDA-832. Moreover, as discussed above, Lilly previously asserted to FDA that

"[b]ased on [the company's] review of the scientific literature, a "protein is a linear polymer of alpha amino acids . . . ." FDA-1318; *see also* FDA-1370 (Lilly similarly asserting that under both "the PHSA and [the] scientific understanding of the term," a protein is a "linear polymer of alpha amino acids . . . ."). Significantly, Lilly did *not* suggest this was an area of disagreement between Lilly's scientific views and FDA's regulatory definition—to the contrary, the company offered no indication that it believed non-alpha amino acids would count under the definition's text. *See id.*

In short, because FDA properly applied its lawful, binding regulatory definition of "protein" in determining that retatrutide is not a protein, that determination was not arbitrary, capricious, or otherwise unlawful under 5 U.S.C. § 706(2).

### B. FDA's Application Of Its Regulatory Definition To Retatrutide Is Further Supported By The Agency's Scientific Reasoning.

Even if 21 C.F.R. § 600.3(h)(6) did not dictate that only alpha amino acids count toward the greater-than-40 requirement, FDA's determination that retatrutide is not a protein would still satisfy the APA because it was a reasonable decision with a reasonable explanation. As noted above, courts review agency adjudications, like FDA's decision on Lilly's Request for Designation, under the APA's "deferential" arbitrary-and-capricious standard. *Prometheus Radio Project*, 592 U.S. at 423. And that standard is "at its most deferential" when examining an agency's "scientific determination" that is within "its area of special expertise." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 103 (1983).[7] Consistent with these principles, in an adjudication, an agency may fill any gaps in its regulations or address new

---

[7] *Loper Bright* did not disturb this principle, but instead, reaffirmed it. 603 U.S. at 395 (explaining that APA review requires a court to ascertain whether an agency "has engaged in reasoned decisionmaking" within the "boundaries" of its authority); *see also Ipsen Biopharmaceuticals, Inc. v. Becerra*, 108 F.4th 836, 840 (D.C. Cir. 2024) (noting, post-*Loper Bright*, that courts must still "be careful not to unduly second-guess [FDA's] scientific judgments").

issues presented by the facts on a case-by-case basis so long as its conclusions are reasonable. *See, e.g., Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J. concurring) (noting some regulations "afford agencies broad policy discretion," in which case "courts allow an agency to reasonably exercise its discretion to choose among the options allowed by the text of the rule").

Applying these principles here, even if FDA's regulatory definition of "protein" did not expressly address whether non-alpha amino acids count toward the greater-than-40 threshold, the agency nonetheless reasonably applied its scientific expertise in deciding they should not. As discussed above (*supra* p. 7-8, 13), FDA reasoned that according to "common scientific knowledge," proteins "are composed of *alpha* amino acids," because alpha amino acids are "the building blocks for all proteins found in nature," including those in humans. FDA-1931-32. The agency cited as "example[s]" multiple "textbooks" supporting its reasoning. FDA-1932 n. 12-15, 17. FDA also reasonably determined that ADO "is not an alpha amino acid because it does not contain an amino group and a carboxylic acid group separated by a single carbon, [] the alpha carbon." FDA-1932. With ADO excluded, there are at most "40 alpha amino acids in retatrutide," so the product does not meet the "greater than 40" threshold. *Id.*

In summary, the regulatory definition's text, context, and history, as well as the scientific rationale underlying the regulation, belie Lilly's claim that FDA was obligated to deem retatrutide a protein. And as discussed below, the company's contrary arguments are meritless.

### C. Lilly's Contrary Arguments Misread The Regulatory Definition, Ignore Its History, And Contradict Broadly Accepted Scientific Principles

**1.** Lilly's counterarguments fail for several reasons. First, the company relies heavily on a misapplication of *Russello v. United States*—the so-called "*Russello* presumption"—which states that when a "statute includes particular language in one section . . . but omits it in another . . . it is generally presumed" this signals a difference in meaning. 464 U.S. 16, 23 (1983). According

to Lilly, the regulatory text's failure to repeat the "alpha" modifier in the phrase "40 amino acids shows that this phrase refers to something *other* than alpha amino acids. Pl. Mem. 12-13.

But Lilly ignores the circumstances that render *Russello's* "general[] presumption," 464 U.S. at 23, inapplicable. First, context sometimes indicates that the omission of a modifier or qualification was not intended to signal a different meaning. *See Clay v. United States*, 537 U.S. 522, 530 (2003) (rejecting the presumption where "one can readily comprehend" another reason Congress used different phrasing). Indeed, while Lilly relies on *Gendron v. United States*, 154 F.3d 672, 674 (7th Cir. 1998) for the proposition that language may never "be implied where it has been excluded," Pl. Mem. 15, the Supreme Court in *Clay* expressly rejected *Gendron's* reasoning and concluded just the opposite: it held that Congress had "spell[ed] out the meaning of 'final'" in one section yet left the same meaning implied in another. 537 U.S. at 530-31; *see also id.* at 525-26 (noting the Court's abrogation of *Gendron*). Thus, *Russello's* presumption gives way where one phrase was intended as a more "concise statement" of another. *City of Columbus v. Ours Garage & Wrecker Serv.*, Inc., 536 U.S. 424, 435-36 (2002). Here, there is overwhelming textual, contextual, and historical evidence that FDA found it unnecessary to repeat the "alpha" modifier through its definition because it was understood to be implied. *See supra* pp. 12-16.[8] For that reason, "*Russello* does not provide a dispositive canon," but rather "a single tool" that, here, is readily "displaced by other tools." *Grand Trunk W. R.R. Co. v. United States Dep't of Lab.*, 875 F.3d 821, 825 (6th Cir. 2017).

More basically, *Russello* is also inapplicable because the "alpha" modifier was not omitted from "another section" of FDA's regulations. 464 U.S. at 23. Instead, it was omitted

---

[8] Thus, FDA did not "fail[] to articulate a rationale" for rejecting Lilly's *Russello* argument. Pl. Mem. 15. Instead, the agency reasonably explained why *Russello* does not apply. *See* FDA-1932.

from FDA's repetition of a term within the same *sentence*. Lilly claims this weakness in its argument as a strength. Pl. Mem. 13 (arguing this makes the omission "more significant"). But this fact makes FDA's explanation for the modifier's omission more plausible, not less. In the metal chain hypothetical above, for instance, the fact that the modifier ("metal") occurs in the same sentence as its implied object ("links") is part of why the modifier need not be repeated.

Lilly's invocation of *United States v. Gonzales,* 520 U.S. 1 (1997) further undermines the company's argument. *See* Pl. Mem. 12-13. In *Gonzales*, the Court considered two phrases that were preceded by the modifier "any," but which were otherwise materially different. *Id.* at 5. The first phrase, "any crime of violence," included an express limitation to federal crimes. *Id.* But the second phrase, "any other term of imprisonment," did not include an express limitation to federal sentences. *Id.* The Court emphasized that the modifier "any" has an "expansive" definition: "one or some indiscriminately *of whatever kind*." *Id.* So Congress's use of this expansive modifier before the second phrase—while also leaving out the limitation to federal crimes it attached to the first phrase—suggested that no such limitation on the second phrase was intended. *Id.*

Here, by contrast, FDA used the *same* phrase—"amino acid"—multiple times in the same sentence, but dropped the "alpha" modifier after the first use. 21 C.F.R. § 600.3(h)(6). Unlike in *Gonzales*, the agency did not use the expansive modifier "any" before the second use of "amino acids," nor did it give any other indication that the second use had a broader meaning than the first. Thus, *Gonzales* helps reveal Lilly's mistake: the company effectively reads the regulatory definition to say that a protein is "any alpha amino acid polymer with a specific, defined sequence of *any* amino acids that total more than 40," when the text says something different.

Nor does the regulatory text's reference to the "total number of amino acids" suggest that non-alpha amino acids would be counted. Pl. Mem. 13. In arguing otherwise, Lilly again ignores

context, which shows that the word "total" does not refer to a combination of alpha *and non-alpha* amino acids. Instead, it signals that, if a product consists of multiple chains that are "associated with each other in a manner that occurs in nature," then the amino-acid count would not be "limited to the number of amino acids in a contiguous sequence," but would instead reflect the "total number" from the associated chains added together. FDA-1350; *see also* FDA-1615 (same). In arguing that the regulation's meaning "turns solely on the broadest imaginable definition" of a single term, Lilly is thus ignoring "linguistic and [regulatory] context" to obfuscate FDA's meaning. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (cleaned up).

Lilly's other arguments about the regulation similarly fail because they do not read it as a whole but instead present it as a series of elements construed in isolation. *See, e.g.,* Pl. Mem. 4, 10 (purporting to identify three independent, enumerated elements in the regulation's text). In fact, Lilly's dissection of phrases in the definition shows why the company's argument fails: the text *lacks* the artificial divisions Lilly inserted to make its point. Instead, read continuously and as a whole, it speaks of an "alpha amino acid polymer . . . greater than 40 amino acids in size." 21 C.F.R. 600.3(h)(6). It is no wonder, then, that Lilly seeks to draw attention from the "alpha" modifier by frequently invoking the isolated phrase "40 amino acids" in its brief, "as if all a reader has to go on is [that] stripped-down phrase." *Pulsifer*, 601 U.S. at 140; Pl. Mem. 1, 5, 8, 11, 12, 13, 19 (isolating this phrase). Lilly's blinkered approach thus neglects perhaps the most fundamental of canons: that "context determines meaning." *Johnson,* 559 U.S. at 139.

**2.** Lilly's arguments are also notable for what they do *not* address. First, the company largely ignores the "history and purpose of [the] regulation." *Boler*, 115 F.4th at 326. It avoids, for example, FDA's assertions before, during, and at the conclusion of the rulemaking emphasizing the scientific consensus that proteins are characterized by their *alpha* amino acid

building blocks. *Supra* pp. 15. Instead, Lilly argues that FDA's statements about the "complexity" of biological products compel the agency to count ADO toward the greater-than-40 threshold because, according to Lilly, ADO is also "complex." Pl. Mem. 14. But nothing in the agency statements Lilly cites, or anywhere else in the "broader regulatory context," suggests FDA would consider ADO's ostensible "complexity" in deciding whether to count it. *Id.*

Second, Lilly faults as unsupported FDA's assertion that, according to "common scientific knowledge," only alpha amino acids are relevant for purposes of determining whether something is a protein. Pl. Mem. 16. But as discussed above, *supra* p. 7-8, 13, 17, FDA consulted multiple scientific sources and offered several rationales in support of this assertion. By contrast, Lilly offers little if any support from the scientific literature for its contrary position. This omission would end the parties' scientific debate even if FDA's expertise were entitled no deference. After all, "something (an agency's finding) beats nothing ([Lilly's] unsupported assertion) every time." *Union Pac. R.R. Co. v. Pipeline & Hazardous Materials Safety Admin.*, 953 F.3d 86, 90 (D.C. Cir. 2020).

Third, Lilly also avoids its own past position that, according to "the scientific literature, Lilly believes" a "protein is a linear polymer of *alpha* amino acids." FDA-1317; *see also* FDA-1370 (asserting that a protein consists of "alpha amino acids" under both "the PHSA and [the] scientific understanding of the term"). There is little if any daylight between these assertions and FDA's view that, according to "common scientific knowledge[,] proteins are composed of alpha amino acids." FDA-1932. Thus, in deriding FDA's rationale as "everybody knows reasoning," Pl. Mem. 16, Lilly is again making "an argument that only a lawyer" would make while "clos[ing] [its] eyes" to the scientific literature as Lilly understands it. *Smith*, 972 F. Supp. 2d at 1052-53. This also undermines Lilly's argument that retatrutide satisfies the regulatory definition

because it "contains [some] alpha amino acids." Pl. Mem. 11. It is difficult to square that position—which would enable molecules containing just *one* alpha amino acid plus 40 other units to be a protein—with Lilly's (and FDA's) scientific understanding of what a protein *is*.

**3.** Lilly's remaining arguments fare no better because they misconstrue the agency's statements. For example, FDA did not base its decision on mere "administrative convenience." Pl. Mem. 15.[9] In the statement Lilly quotes, FDA was invoking just *one* of the rationales the agency had put forward, during the rulemaking on its regulatory definition, for why it was adopting a "bright line" greater-than-40 threshold. *Id.* (quoting FDA-1925). And Lilly omits that, in invoking "regulatory uncertainty," FDA was also concerned about predictability and efficiency for the benefit of regulated industry and, by extension, patients who have an interest in accessing safe and effective medications without delay. *See, e.g.,* FDA-1811 (explaining that a "clear rule facilitates efficient use of time and resources by *both FDA and applicants* and reduces regulatory uncertainty"); FDA-803 (seeking to avoid "inconsistent decision-making," "large transaction costs," and "uncertainty" that may "negatively impact product development."). Contrary to Lilly's suggestion, these valid considerations warrant deference. *See, e.g., Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) ("An agency has wide discretion in making line-drawing decisions" so long as it "explain[s] [the line's] relationship to the underlying regulatory concerns.").

Nor is FDA's rationale for excluding non-alpha amino acids both "overinclusive and underinclusive." Pl. Mem. 17. Lilly argues that rationale is "internally inconsistent" because it "exclud[es]" non-alpha amino acids that, according to Lilly's interpretation of the regulatory text,

---

[9] Indeed, as discussed above (*supra* p. 3), regardless of whether Lilly must ultimately file a new drug application or a biologics license application for retatrutide, that application will receive the same level of scientific scrutiny from FDA regarding safety and efficacy.

should be "includ[ed]" in the analysis. Pl. Memo. 17-18. But this circular argument fails because it rests on Lilly's own interpretation which, for the reasons discussed above, is incorrect.

Lilly also argues that part of FDA's rationale is "underinclusive" because, according to the company, it would exclude "proline—a common amino acid used in natural protein synthesis." Pl. Mem. 18. But by failing to raise this argument before the agency, Lilly forfeited it. *See Carr v. Saul*, 593 U.S. 83, 88 (2021) (issue exhaustion "require[s] parties to give the agency an opportunity to address an issue before seeking judicial review of that question"); 21 C.F.R. § 10.45(f) (requiring exhaustion of administrative remedies and limiting FDA determinations to the "administrative record" of arguments and materials submitted to the agency).

Even if the Court considers it, however, Lilly's proline argument lacks merit. According to the scientific literature, proline—unlike ADO—is one of "the 'standard' 20 amino acids" that comprise the building blocks of proteins. FDA-1651; FDA-1943 (similar); *see also* FDA-1931 (FDA, discussing the same "20 alpha amino acids"). Proline is also "unique among" that group of 20 because its structure is different from the others. FDA-1651; *see also* FDA-1655 (describing proline as the "exception" to the structure "of the [20] amino acids commonly used in proteins"). Thus, the literature often describes proline as an alpha amino acid even though, as Lilly points out, it does not "meet [the] strict definition" of one. Pl. Mem. 18; FDA-1945 (noting "that proline is considered as an [alpha amino acid] even though" it is different from the others). Consistent with all of these principles, FDA counted the prolines in retatrutide toward the regulatory definition's "greater than 40" threshold. *See* FDA1905-1906 (listing four prolines, abbreviated as "P," in retatrutide's "backbone of 39 alpha amino acids"). But FDA did not count ADO because, unlike proline, it is *not* an alpha amino acid, and thus, not one of the building blocks for all proteins found in nature, including in humans. FDA-1931-32.

Finally, Lilly's comparison of retatrutide to Sogroya (Pl. Mem. 11) is inapt. As FDA explained, Sogroya is a protein because "the protein part" of that product "consists of a 191 alpha amino acid chain." FDA-1933. The fact that Sogroya *also* has "an albumin-binding moiety," which includes ADO, that "has been attached" to those 191 alpha amino acids "does not change that Sogroya is a protein." *Id.* By contrast, retatrutide's "main" chain "is composed of only 39 alpha amino acids," and even if its second chain is added to the analysis, the product consists, *at most*, of 40 alpha amino acids, which is not "greater than 40." FDA-1932.

For all these reasons, FDA reasonably determined—in a manner consistent with the controlling statutory and regulatory authorities—that retatrutide is not a protein.

## II. FDA Also Reasonably and Lawfully Determined That Retatrutide Is Not Analogous To A Protein

**1.** Like "protein," the PHSA does not define "analogous product." While FDA has not promulgated a regulation defining when something is analogous to a protein under the PHSA, it has explained that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded" by the final rule defining "protein." FDA-1935 (quoting 85 Fed. Reg. 10057, 10061 (Feb. 21, 2020)). For the reasons discussed above, FDA found that retatrutide consists, at most, of 40 alpha amino acids. On that basis, FDA determined that it is "specifically excluded" from the definition of "protein" and therefore cannot be considered "analogous" to one. FDA-1935-36.

FDA reasoned that, were it otherwise, any peptide with fewer than 41 alpha amino acids would be eligible for classification as a biological product under the "analogous product" provision. FDA-1935. This would render the agency's carefully crafted and duly promulgated regulatory definition of "protein" meaningless. *Id.* In other words, permitting products that are specifically excluded from the definition of "protein" to be analogous to a protein would create a

24

back-door exception that would effectively swallow the rule, undermining its very purposes. *See supra* p. 22 (discussing the rule's rationales).

FDA also provided a scientific rationale for its determination that retatrutide is not analogous to a protein. As the agency explained, "being greater than 40 *alpha* amino acids is a fundamental, defining property of a protein, which retatrutide does not have." FDA-1936. Thus, regardless of what else retatrutide arguably has in common with a protein, it is unlike a protein in this *fundamental way* and therefore cannot be considered "analogous" to one.[10] Even in the wake of *Loper Bright*, courts do not "second guess" these kind of scientific judgments. *Ipsen*, 108 F.4th at 840, 846. For all these reasons, FDA's determination was "reasonable and reasonably explained," and it therefore satisfies the APA. *Prometheus Radio Project*, 592 U.S. at 417.

**2.** Most of Lilly's arguments that FDA violated the "analogous product" provision of the PHSA have already been rejected by multiple courts. For example, Lilly argues that FDA "effectively reads[] the word 'analogous' out of the statute." Pl. Mem. 19, 23. But this is demonstrably false because FDA has already identified at least one type of product "that it considers analogous to a protein": certain "naturally derived mixtures that include" a protein component along with "non-biological product components that can contribute to the product's activity." Pl. Mem. 21 (quoting FDA-1935). For that reason, multiple courts have concluded that FDA plainly "did not read 'analogous' out of the statute." *Ipsen*, 108 F.4th at 845; *see also Teva*, 514 F. Supp. 3d at 115 ("analogous to proteins is not [] a null set under FDA's construction").

Perhaps for this reason, Lilly retreats to a different position. While acknowledging that the analogous to a protein provision does "*some* work" under FDA's reasoning, Lilly thinks it

---

[10] To illustrate: if one determined a vehicle needed four wheels and an engine to be a car, it would make little sense to say a two-wheeled bicycle is "analogous" to a car. But a pickup truck could be because it includes a car's most essential characteristics (four wheels and an engine).

does too little. Pl. Mem. 24. But the company identifies nothing unlawful about that. Indeed, even if FDA "understand[s] the 'analogous product' category as a narrow residual provision meant to accommodate products that satisfy the regulatory definitions of each category . . . but are not an exact fit," that "offers a reasonable method," that is consistent with the PHSA, for distinguishing "sufficiently similar products from products that are too distinct to be" analogous. *Teva*, 108 F. Supp. 3d. at 116; *see also Ipsen*, 108 F.4th at 846 (noting that "FDA applies 'analogous product' narrowly as to proteins" for reasons rooted in its "scientific expertise").

Lilly next argues that FDA's rationale effectively requires something to "contain[] a protein" to be analogous to one which, according to Lilly, conflicts with the definition of "analogous." Pl. Mem. 21. The D.C. Circuit rejected a similar argument as "unfairly reductive." *Ipsen*, 108 F.4th at 846. As it explained, the kinds of mixtures FDA has found to be analogous to a protein simply show that "it is *possible* for an active ingredient to share a protein's critical characteristics[] while also having other distinguishable characteristics." *Id.* at 845-46. But because FDA has not promulgated a rule defining what is analogous to a protein, the agency "leave[s] open the possibility that *other* substances that [it] has not considered and directly addressed could be analogous to a protein even if" they do not contain one. *Id.* at 846.

This undermines Lilly's argument that "analogous" and "contain" have different definitions. Pl. Mem. 21-22. That is because, in the absence of a categorical definition, FDA has not suggested that something *must* contain a protein to be analogous to one. Instead, that is simply one attribute of the analogous-to-protein products FDA has identified while refining this category through adjudicatory, "case-by-case determinations." *Ipsen*, 108 F.4th at 839; *see also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765 (1969) (acknowledging agencies' authority to develop regulatory policy over time through "[a]djudicated cases").

Overlooking all of the above, Lilly's struggles, but fails, to distinguish *Ipsen* and *Teva* on their facts. To be sure, the "critical characteristic" at issue in *Teva* (the lack of a specific, defined sequence) was different from the one at issue here (the lack of more than 40 alpha amino acids). Pl. Mem. 24. But in *Teva*, FDA maintained—just as it does now—that "a product cannot fail entirely to meet *one of* the agency's definitional criteria for a category of biological products yet nonetheless become a biological product." 514 F. Supp. 3d at 116 (describing and approving of FDA's approach). Similarly, in *Ipsen*, FDA maintained—as it does here—that one of the "critical characteristics" a product must share with a protein to be analogous to one is "the [minimum] size of the amino acid polymer." 108 F. 4th at 844. Thus, the agency did not "shift its position" between those cases and this one. Pl. Mem. 25.[11]

Lilly also argues that FDA violated the PHSA by creating "multiple, inconsistent definitions" of the "analogous product" provision. Pl. Mem. 22-23. This again ignores that, unlike the other categorically-defined subsets of analogous products the company cites, FDA has *not* promulgated a definition for what it means to be analogous to a protein. *See* 21 C.F.R. § 600.3(h)(5)(i)-(iii). Therefore, Lilly's effort to show inconsistency between the categories' "definitions" is premature.

Regardless, Lilly also fails to establish any inconsistency between the approach FDA took here and those it has taken for other categories. FDA need not (and likely could not) define, for example, products that are "analogous" to a "virus" and those "analogous" to a "protein" in precisely the same way because each category requires different "scientific judgments" about how and where to draw the line. *Ipsen*, 108 F.4th at 846. In other words, the particular approach

---

[11] Lilly also suggests *Teva's* rationale did not survive *Loper Bright* because the former relied on *Chevron*. Pl. Mem. 25. But again, the Supreme Court explicitly did "not call into question" cases like *Teva* in overruling the *Chevron* doctrine. *Loper Bright*, 603 U.S. at 376.

taken to the statutory term "analogous product" necessarily depends on the particular category of biological product in question. *See Teva*, 514 F. Supp.3d at 32 (noting that "'analogous product' takes on a meaning appropriate to each category it modifies, rather than a one-size-fits-all approach."). Thus, Lilly's assertion that "the *same* statutory text" should not be given "different meaning in different cases," Pl. Mem. 23, fails because the categories at issue do not involve a single statutory term. Rather, the "analogous product" provision must "be read as applicable to each of the listed examples that precede it." *Ipsen*, 108 F. 4th at 845.

**3.** Lilly also fails to establish that FDA's determination was arbitrary or capricious. The agency did not cite only a "single ground" in finding that retatrutide is not analogous to a protein. Pl. Mem. 26. Rather, it offered both scientific and policy-based rationales. *Supra* p. 24-25. Nor did FDA "avoid" an "inquiry" about analogous products that the PHSA "mandated." *Id.* Instead, the agency addressed and reasonably rejected Lilly's arguments. *See* FDA-1935-36.

Lilly's categorical rejection of FDA's policy-based rationale, Pl. Mem. 26, misconstrues FDA's reasoning and misstates the law. As discussed above, FDA did not reject Lilly's argument "merely" for the agency's own "convenience." Pl. Mem. 26. As discussed above, in adopting a bright-line, greater-than-40 threshold, the agency was concerned not just with administrative efficiency but also the ways in which "regulatory uncertainty" and potential "inconsistent decision-making" could negatively impact regulated industry and product development. FDA-1811, 803. Lilly's unsupported assertion that these considerations are manifestly invalid and "entitled to *no* deference," Pl. Mem. 26, is mistaken. *See, e.g., Nat'l Shooting Sports Found.*, 716 F.3d at 214 ("An agency has wide discretion in making line-drawing decisions" and "is only required to identify the standard and explain its relationship to the underlying regulatory concerns"); *ExxonMobil Gas Mktg. Co. v. FERC,* 297 F.3d 1071, 1085 (D.C. Cir. 2002) ("We are

generally unwilling to review line-drawing" unless the "lines drawn" are "patently unreasonable, having no relationship to the underlying regulatory problem"); *Actavis Elizabeth LLC v. U.S. FDA*, 625 F.3d 760, 766 (D.C. Cir. 2010) ("[A]gencies may employ bright-line rules" even for "reasons of administrative convenience" if they "fall within a zone of reasonableness").[12]

Lilly argues that "the statute's command" overrides such concerns. Pl. Mem. 27. But as discussed above, the company has failed to identify any statutory command that FDA violated. And Lilly neglects that in the PHSA, Congress defined neither "protein" nor "analogous product." The question, therefore, is whether FDA's Designation Letter proceeded "subject to the limits imposed by a [statutory] term" that left the agency "with flexibility," and whether it "engaged in reasoned decision[-]making within those boundaries." *Loper Bright*, 603 U.S. at 395. For all the reasons discussed above, it did.

## III. Vacatur And Remand Would Be The Only Appropriate Remedy.

Finally, even if any of Lilly's claims had merit, vacatur and remand would be the appropriate remedy in this case. An agency action held unlawful under 5 U.S.C. § 706(2) should ordinarily be vacated and remanded for further proceedings. *See, e.g., Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) ("If the decision of the agency is not sustainable," it "must be vacated and the matter remanded . . . for further consideration."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (similar); *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (because "a district court" in an APA case "sits as an appellate tribunal," if it "determines that an agency made an error of law . . . the case must be

---

[12] Nor was FDA's adoption of a bright-line rule "admittedly arbitrary." Pl. Mem. 27. Aside from the above considerations, it was "supported by scientific sources" reflecting that "size" is a key attribute that defines a protein. FDA-1612 (citing "[t]extbook [d]efinitions" of protein); FDA-1613 (noting the 40-amino-acid threshold was "based on the scientific literature").

remanded"). Lilly's request for an "injunction requiring FDA to designate retatrutide as a biological product," Pl. Mem. 30, is therefore manifestly improper.

Lilly's position that "remand would accomplish nothing but delay," Pl. Mem. 29, ignores the remaining issues to be decided by the agency. If the Court rejected the rationale underlying FDA's determination that retatrutide is not analogous to a protein, there remain several arguments on that issue the agency has yet to address. *See* Pl. Mem. 20 (offering arguments for why, as a scientific matter, Lilly believes retatrutide is analogous to a protein). The same would be true if the Court rejected the rationale underlying FDA's determination that retatrutide is not a protein. *See* FDA-1931-32 ("assum[ing]," but "without conceding," multiple scientific issues).

Finally, Lilly offers no authority for its sweeping argument that the existence of a "statutory deadline" for agency action—a common feature in administrative law—automatically precludes remand. Pl. Mem. 29. Nor does Lilly square this argument with cases in which FDA designation decisions were "remand[ed] to the agency" after being vacated. *Genus Med. Techs., LLC v. FDA*, 427 F. Supp. 3d 74, 87 (D.D.C. 2019); *see also Prevor v. FDA*, 67 F. Supp. 3d 125, 139-40 (D.D.C. 2014) (rejecting a request "to order FDA to regulate" a product in plaintiff's preferred category and instead remanding to the agency).

## CONCLUSION

For the foregoing reasons, Defendants' Cross-Motion for Summary Judgment should be granted and Plaintiff's motion should be denied.

March 18, 2025

Respectfully submitted,

/s/ *Scott P. Kennedy*
SCOTT P. KENNEDY
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
(202) 305-1837
Scott.P.Kennedy@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the CM/ECF system, and that service will be accomplished by that system on registered participants as identified on the Notice of Electronic Filing.

March 18, 2025                                /s/ Scott P. Kennedy
                                             SCOTT P. KENNEDY